**THIRD DIVISION**
**MIKELL, P. J.,**
**MILLER and BLACKWELL, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 3, 2012**

# In the Court of Appeals of Georgia

A12A0318. CROSS v. IVESTER.

MILLER, Judge.

Nathaniel James Cross was found to be in wilful contempt for his failure to pay $22,810.15 in back child support and was sentenced to incarceration on the work release program pending his payment of all past due and current child support, as well as attorney fees. This Court granted Cross's request for discretionary review of the trial court's contempt order. On appeal, Cross argues that (1) the trial court erred in finding that Cross was in wilful contempt for failure to pay child support; (2) the trial court erred in modifying Cross's visitation schedule at the contempt hearing; (3) the trial court exceeded its authority in temporarily revoking Cross's work release assignment; and (4) the trial court erred in not releasing Cross from incarceration

when it became aware of his appeal to this Court. For the reasons that follow, we affirm.

"[A] trial court has broad discretion to determine if a party is in contempt of its order, and the exercise of that discretion will not be reversed on appeal unless grossly abused." (Citation and punctuation omitted.) *Hunter v. Hunter*, 289 Ga. 9, 11 (4) (709 SE2d 263) (2011).

Cross has two minor children with Kendra Ivester. In 2006, Cross and Ivester agreed to a consent order awarding them joint legal custody of their two minor children and awarding Ivester primary physical custody. Cross was given visitation rights and ordered to pay child support in the amount of $600 per month. At the time the consent order was entered, Cross was working as an insurance salesman and making a gross monthly income of $2,400. Cross was subsequently terminated in February 2007. Thereafter, Cross began doing various manual labor jobs until he was injured and could no longer do heavy lifting or construction; Cross claims that he then sought employment in the insurance field, but was overqualified for most of those positions. Although Cross was eventually offered a commission-based insurance sales position, Cross explained that he "thought about it and prayed about it, and when it come down to it, [he] said, you know, if I'm going to work commission for someone and split commissions, why don't I just work for myself and

2

just make all the commission." Consequently, Cross declined the sales position opportunity and instead started his own insurance business. By July 8, 2008, Cross's child support arrearage totaled $4,295. As a result, and because Cross was in the process of starting up his own business, the parties agreed to an amended consent order effective July 15, 2008. The amended consent order modified Cross's child support obligations as follows:

(1) Cross's child support obligation was reduced to $100 per month from August 1, 2008, through April 30, 2009;

(2) Cross's child support obligation was increased to $500 per month effective May 1, 2009, through July 31, 2009;

(3) Cross's child support obligation was increased to $650 per month effective August 1, 2009;

(4) Cross was to pay as he could toward the arrearage of $4,295 from August 1, 2008, through April 30, 2009;

(5) Cross would pay at least 25% of his arrearage from May 1, 2009, through April 30, 2010; and

(6) Cross would pay at least 25% of his arrearage in each 12-month period thereafter until satisfied in full.

Following this amended consent order, however, Cross made only one payment of $300 in 2008 and two payments of $25 in 2011. Accordingly, on February 18, 2011, Ivester filed a motion to hold Cross in contempt for failing to pay child support in accordance with the trial court's amended consent order.

A hearing on the contempt action was conducted on June 15, 2011. At the start of the hearing, Ivester also made an oral motion to modify Cross's visitation schedule. On June 28, 2011, the trial court entered an order finding Cross to be in wilful contempt of the provisions set forth in the amended consent order and that as of the date of the contempt hearing, Cross's arrearage totaled $22,810.15. The trial court ordered that Cross be incarcerated at the county jail starting Saturday, July 2, 2011, and remain incarcerated therein on work release Monday through Friday, 7:00 a.m. to 6:00 p.m., until he purged himself of such contempt by payment to Ivester of all past due and current due child support, as well as $1,000 in Ivester's attorney fees. The trial court's order further provided, however, that the incarceration provisions would be suspended upon Cross's payment to Ivester of $5,000 before July 1, 2011, which would be applied toward the arrearage, and so long as all future child support payments in the amount of $650 per month, plus an additional $250 per month to be applied to the arrearage until paid in full, were kept current beginning July 1, 2011.

4

Cross was also required to pay the $1,000 in attorney fees by October 1, 2011, for the suspension of incarceration to remain in effect. The trial court's order further modified Cross's visitation schedule with the minor children.

On August 19, 2011, the trial court found Cross in violation of his work release status and revoked Cross's work release provision for a period of ten days beginning August 21, 2011. On August 22, 2011, following this Court's grant of Cross's application for discretionary appeal, the trial court ordered Cross's immediate release from both incarceration and enforcement of the trial court's order pending appeal.

1. In his first enumeration, Cross argues that the trial court erred in finding him in wilful contempt for failure to pay child support because he allegedly demonstrated that his financial situation rendered him unable to pay.[1] We disagree.

"A person who has failed to pay child support under a court order when he has the ability to pay may be subject to incarceration for either civil or criminal contempt." (Citation omitted.) *Gallaher v. Breaux*, 286 Ga. App. 375, 377 (650 SE2d

---

[1] Embedded in this enumeration of error is the argument by Cross that the contempt order violated his constitutional due process rights. "But a party cannot expand its enumerations of error through argument or citation in its brief. Hence, [Cross] has waived and abandoned this assertion of error for purposes of appeal." (Citations and punctuation omitted.) *Westmoreland v. JW, LLC*, 313 Ga. App. 486, 491 (4) n. 1 (722 SE2d 102) (2012).

5

313) (2007). As Cross "was sentenced for an indefinite period until the performance of a specific act (i.e., payment of back support), the contempt in this case was civil." (Citation and punctuation omitted.) Id.

> And if there is any evidence to support the trial court's finding of a wilful refusal to comply with a court order, this [C]ourt will affirm the order of contempt. Thus, the question of whether a contempt has occurred is for the trial court, and its determination will be overturned only if there has been a gross abuse of discretion.

(Citations and punctuation omitted.) Id.

Where the person lacks the ability to pay the child support, however, the trial court must release the party from incarceration for civil contempt. Id. As the Supreme Court of Georgia has held,

> [a] trial court . . . may not continue incarceration for civil contempt when the respondent lacks the ability to purge himself. Imprisonment under civil sanctions is always conditional and a party found in contempt may apply for release at any time upon a showing of inability to pay. As we have long held, the moment it appears that there is inability, it would clearly be the duty of the judge to discharge the party. Because the purpose of civil contempt is to provide a remedy and to obtain compliance with the trial court's orders, the justification for imprisonment is lost when that compliance is impossible.

6

(Footnotes and punctuation omitted.) *Hughes v. Ga. Dept. of Human Resources*, 269 Ga. 587, 587-588 (2) (502 SE2d 233) (1998). Here, Cross contends that the trial court's finding of wilful contempt was an abuse of discretion because the trial court did not identify (i) any ability of Cross to have paid the child support amounts previously ordered and found to be in arrears; (ii) where the money to pay these child support amounts would come from; or (iii) where Cross could borrow the funds. Notwithstanding his contentions however, the burden was on Cross, and not the trial court, to affirmatively show his inability to pay. See *Weiner v. Weiner*, 219 Ga. 44 (131 SE2d 561) (1963). Indeed,

> [i]nability to pay is a defense only where the contemnor demonstrates that he has exhausted all resources and assets available and is still unable to secure the funds necessary to enable compliance with the court's order. He must show clearly that he has in good faith exhausted all the resources at his command and has made a diligent and bona fide effort to comply with the order of the court, and that he cannot borrow sufficient funds to comply with the obligation.

(Citations and punctuation omitted.) *Darroch v. Willis*, 286 Ga. 566, 569 (2) (690 SE2d 410) (2010); see also *Mahaffey v. Mahaffey*, 238 Ga. 64, 65 (2) (230 SE2d 872) (1976) ("The burden . . . is on the one refusing to pay to show that he has in good faith exhausted all of the resources at his command and has made a diligent and bona

7

fide effort to comply with the decree awarding alimony or child support.") (citation and punctuation omitted). Here, Cross did not meet this burden.

As an initial matter, Cross did not clearly show that his earnings were insufficient so as to render him unable to pay anything more than $350 in child support payments since July 2008. Although Cross testified generally that he has paid what he can afford in child support after paying his expenses, Cross's only evidence of his earnings consisted of the following: a one-month statement from his business checking account in 2011 showing an available balance of $89.40; tax records for the year 2010 showing an adjusted gross income of $672; and documentation from creditors showing various unpaid bills and expenses in 2011. None of this evidence, however, clearly revealed the amount of Cross's earnings from the time of the July 2008 amended consent order through the present. Cf. *Vickers v. Vickers*, 220 Ga. 258, 259-260 (138 SE2d 308) (1964) (affirming trial court's judgment of contempt where father relied primarily upon a copy of his federal income tax return for one year and his testimony was otherwise "wholly insufficient to show conclusively or affirmatively that he was unable to comply with the former judgment of the court"); *Scruggs v. Scruggs*, 184 Ga. 853, 854 (193 SE2d 865) (1937) (affirming trial court's finding of contempt and incarceration where contemnor merely swore that his income

8

was insufficient to enable him to pay child support obligations without revealing the amount of those earnings).

Nor did Cross clearly show that he has been incapable of finding productive employment since July 2008. As of July 2008, Cross was self-employed and his business was producing no net income. In fact, it was the startup of his new business that was the impetus for temporarily decreasing Cross's child support obligations in the amended consent order. Cross claims that he is still in the process of "building up" his insurance business, and as of the date of the 2011 contempt hearing, Cross testified that his "book of business [was] breaking even." Since starting his apparently unprofitable business however, there is no evidence that Cross has sought other and more profitable employment.[2] See *Scruggs*, supra, 184 Ga. at 854-855 (affirming trial court's finding of contempt and incarceration; despite contemnor's claim that the income from work at his mother's café was insufficient to pay his child support obligations, it did not appear that contemnor had made any effort to obtain other and more profitable employment). This is despite the fact that Cross has an associate's degree in accounting, a bachelor's degree in business, a stock broker license, and an

_____

[2] Despite Cross's claim that his injuries prevented him from some jobs and that he was found to be overqualified for other jobs, the evidence indicates that these other job opportunities were sought before Cross decided to start his own business.

insurance license, and claimed that he was "very well qualified for a lot of positions, mostly insurance and broker."

Finally, Cross did not clearly show that he had in good faith exhausted all of the resources and assets at his command since July 2008. See *Darroch*, supra, 286 Ga. at 569 (2). Cross admitted that he owned three properties. Cross rented out two of the properties in order to cover their respective mortgage payments. Although Cross claimed that he made no profit from the rent payments, he failed to reveal the amounts of rent he actually received or the mortgage payments the rent was supposed to cover. Cross did not show how much equity he had in either property; he testified only that he owed approximately $85,000 on each and that one of the properties was in foreclosure. Cross claimed that he had been trying to sell these properties, but had been unsuccessful. Beyond his testimony, however, the only evidence of his efforts to sell consists of a 2011 email from a real estate broker asking if Cross was still interested in selling one of his homes. The third property Cross owned is the office building from which Cross runs his insurance business. Again, Cross failed to show how much equity he had in the property; he testified only that he owed about $40,000 on it and that it "has no value" because "the land is disintegrating and falling apart." Cross also testified that he rented out an apartment in the office building to help pay

the mortgage. Cross explained that he had not tried to sell this third property because he would not be able to conduct any business without his office. Apart from his three properties, Cross also admitted that he owned a diamond ring and a vehicle, both of which he claimed he had been trying to sell. Cross did not show the value of either item; he testified only that his "car's engine is about to blow up, so there's not too many people chomping at the bit to buy it," and that the engagement ring "is basically not worth anything of value, because you can get them for nothing now."

While the foregoing evidence certainly disclosed Cross's current financial struggles, we cannot say that Cross showed conclusively or affirmatively that he had the inability to comply with the amended consent order or to purge himself of the contempt at the time of the hearing. See *Vickers*, supra, 220 Ga. at 260. Significantly, we note that "[t]he contempt question, including any factual issues as to the former husband's ability to pay, is for the trial court to determine and that court's adjudication will not be reversed on appeal unless there has been an abuse of discretion." (Citations and punctuation omitted.) *Mahaffey*, supra, 238 Ga. at 65 (2). Had Cross been making partial payments from time to time, that might have indicated to the trial court his good faith in attempting to comply with the amended consent order. See *Scruggs*, supra, 184 Ga. at 855. Since July 2008, however, Cross has paid

11

only a total of $350 toward the $22,810.15 he owes in back child support. Given the showing, or lack thereof, made by Cross at the contempt hearing, we cannot conclude that the trial court abused its discretion in finding that Cross was in wilful contempt for failing to comply with the child support obligations set forth in the amended consent order.

2. Cross argues that the trial court erred in entertaining Ivester's motion for modification of the visitation schedule because (i) he should have been allowed more of an opportunity to prepare for the issue of visitation; and (ii) venue was improper. We discern no error.

Under OCGA § 19-9-3 (b), the trial court is expressly authorized to modify visitation rights, on the motion of any party or on the motion of the judge, during a contempt proceeding. *Gildar v. Gildar*, 309 Ga. App. 730, 731 (710 SE2d 913) (2011). And "[i]f reasonable evidence exists in the record to support the trial court's decision to change visitation rights, then the decision of that court will stand. The trial court's decision will not be overturned absent abuse of discretion." (Punctuation and footnote omitted.) Id. at 731-732. Here, the trial court modified Cross's visitation schedule upon Ivester's oral motion for modification of visitation at the contempt hearing.

(i) Notwithstanding its authority to modify Cross's visitation schedule, Cross argues that the trial court nevertheless abused its discretion in proceeding with the visitation issue because it did not afford Cross "the time necessary to respond to such an important issue." Specifically, Cross claims that "[t]he trial judge could have acknowledged [Ivester's] motion and set the matter over for a further hearing on that issue at a later date, thereby affording [Cross] an opportunity to prepare for the issue of visitation." Significantly, however, such is not required by OCGA § 19-9-3 (b), and Cross cites no authority providing otherwise. Moreover, Cross was afforded more than one opportunity to respond to Ivester's motion for modification – not only was he permitted to both cross-examine Ivester and provide his own direct testimony at the contempt hearing, but he was also allotted an additional ten days in which to submit a written brief in further support of his arguments on the visitation issue.

(ii) Cross also argues that the Superior Court of Stephens County (the county in which both child support orders were entered) was not the proper venue for Ivester's motion for modification of visitation because Cross was a resident of Franklin County, Georgia, at the time of the contempt hearing. Cross nevertheless waived any challenge to venue by failing to ever object to venue, or otherwise raise the issue, in the trial court below. See *Daust v. Daust*, 204 Ga. App. 29, 31 (418 SE2d

13

409) (1992) ("The defenses of lack of personal jurisdiction and improper venue clearly may be waived, even in child custody cases.") (citations omitted); see, e.g., *Ganny v. Ganny*, 238 Ga. App. 123, 125 (2) (518 SE2d 148) (1999) (concluding that wife, as defendant in counterclaim for custody, waived venue challenge where her only objection to venue occurred during closing argument); *Houston v. Brown*, 212 Ga. App. 834, 834-835 (443 SE2d 3) (1194) (holding that husband waived lack of venue defense to wife's counterclaim in an action for modification of child visitation where husband did not move to dismiss counterclaim until after trial was complete and a temporary order was issued).

Accordingly, neither of Cross's challenges provide a basis for reversal of the trial court's modification to the visitation schedule.

3. Cross argues that the trial court exceeded its authority in temporarily revoking Cross's work release status because the contempt order did not provide "direction as to the limitations on his movement during the specified periods of work release." Cross's argument is meritless.

OCGA § 51-1-4 (c) authorizes a trial court to sentence those gainfully-employed persons found in contempt of an order to pay court-ordered child support to a term of confinement in a diversion center and participation in a diversion

14

program if such a program has been established by a county pursuant to OCGA § 42-8-130. OCGA § 42-8-130 provides, in pertinent part, as follows:

> While in such diversion program, the respondent shall be authorized to travel to and from his or her place of employment and to continue his or her occupation. The official in charge of the diversion program or his or her designee shall prescribe the routes, manner of travel, and periods of travel to be used by the respondent in attending to his or her occupation. . . . *When the respondent is not traveling to or from his or her place of employment or engaging in his or her occupation, such person shall be confined in the diversion center during the term of the sentence.* With the approval of the sheriff or his or her designee, the respondent may participate in educational or counseling programs offered at the diversion center. . . . *If the respondent fails to comply with any of the requirements imposed upon him or her in accordance with this Code section, nothing shall prevent the sentencing judge from revoking said assignment to a diversion program and providing for alternative methods of incarceration.*

(Emphasis supplied; punctuation omitted.)

Here, the trial court properly directed Cross to a work release program. Cf. *Gallaher*, supra, 286 Ga. App. at 378. The trial court found that Cross violated the terms of his work release, however, when he brought paperwork to the office of a superior court judge in Clarksville, Georgia, during the hours that Cross was

15

supposed to be at work. As a result, the trial court revoked Cross's work release assignment for a period of ten days, during which time Cross was to be incarcerated without leaving the diversion center to engage in his occupation. The trial court did not exceed its authority in doing so. Pursuant to the clear language of OCGA § 42-8-130, Cross was not authorized to be anywhere else besides the detention center, his place of employment, or traveling to and from his place of employment. In light of Cross's failure to comply with these requirements, OCGA § 42-8-130 authorized the trial court to revoke Cross's work release status.

4. In his final enumeration of error, Cross argues that the trial court erred in failing to release him from incarceration when it became aware of his pending appeal in this Court. Again, Cross's argument is meritless.

> In contempt cases, a grant of supersedeas is governed by OCGA § 5-6-13 (a), which provides:

> A judge of any trial court or tribunal having the power to adjudge and punish for contempt shall grant to any person convicted of or adjudged to be in contempt of court a supersedeas upon application and compliance with the provisions of law as to appeal and certiorari, where the person also submits, within the time prescribed by law, written notice that he intends to seek review of the conviction or adjudication

of contempt. It shall not be in the discretion of any trial court judge to grant or refuse a supersedeas in cases of contempt.

> This Code section requires a court to grant supersedeas only if a person applies for supersedeas and submits a written notice of intent to appeal.

(Footnote omitted.) *Blake v. Spears*, 254 Ga. App. 21, 25 (5) (561 SE2d 173) (2002). Here, Cross filed his application for discretionary appeal on July 27, 2011. However, there is no indication that Cross submitted either an application for supersedeas or a written notice of intent to appeal as required by OCGA § 5-6-13 (a). "Thus, the record contains no evidence that [Cross] complied with OCGA § 5-6-13 at this juncture, and the trial court [would not have erred] in refusing to grant supersedeas under that section." (Punctuation and footnote omitted.) Id. That said, we note that one week after this Court granted Cross's application for a discretionary appeal, and on the same day that Cross filed his timely notice of appeal, the trial court ordered Cross's immediate release from incarceration and enforcement of the contempt order. Therefore, Cross has not shown any reversible error.

*Judgment affirmed. Mikell, P. J., and Blackwell, J., concur.*

17