2009 VT 106

### Jane KROCHMALNY v. Wayne MILLS

[987 A.2d 318]

No. 08-294

¶ 1. November 3, 2009. Defendant-husband Wayne Mills appeals the Windham Family Court's contempt order and subsequent mittimus resulting from his failure to make payments toward arrears-only child support to plaintiff-wife Jane Krochmalny. Husband claims that the family court erred in ordering his incarceration for failure to pay a $2800 purge of contempt order because the court did not afford him a hearing or determine if he had a present ability to pay the purge amount. We agree and accordingly reverse and remand to the family court.

¶ 2. The facts in this case are largely uncontested. Husband and wife were married for twenty years. The family court finalized their divorce in 1996 and ordered husband to pay child support. In 2005, when their youngest son graduated from high school at age eighteen, the child-support obligation converted to an arrears-only order; at that point husband owed wife over $29,000. In 2007, to avoid a contempt hearing on this still unpaid obligation, the parties, along with the Office of Child Support (OCS), entered into a stipulation under which husband agreed to make a "good faith monthly payment" of at least $400 towards the more than $39,000 he then owed wife. This stipulated agreement expressly did not alter husband's obligation to pay the outstanding arrears, but rather was in exchange for resolving the outstanding contempt motion. Under the agreement, husband's failure to make the good faith payments would result in OCS filing an affidavit of noncompliance and moving the court to hold a contempt sanctions hearing "to determine any and all remedies available, including the possibility of imposing a term of incarceration in order to coerce payment and compliance."

¶ 3. After several successful months of this arrangement, husband made his last payment on December 10, 2007, for the month of November. On December 12, the Real Estate Commission of the Vermont Secretary of State's Office of Professional Regulation suspended husband's real estate broker's license based on an allegation of unprofessional conduct. Husband later entered into a stipulation and consent order with the Commission in which he admitted to some unethical conduct and agreed to a series of conditions under which the State would consider reinstating his license. These conditions included a forty-hour broker's

course and periodic review of his client trust accounts. His license would remain suspended until completion of the broker's course, at which point husband could petition to have his license reinstated.

¶ 4. As realtor fees were his major source of income, husband filed a motion to modify child support on January 10, 2008, based on his changed circumstances. At the same time, because he had violated the terms of their stipulated agreement, OCS filed a motion for contempt. The family court heard both motions at a hearing on May 27, 2008.

¶ 5. At the hearing, husband testified to the fact that he had received almost no income from his real estate business since September 2007 and had virtually no assets or money. The lone real estate commission he had received — from the same transaction that brought about the embezzlement allegation — was for $4000 in February 2008. In addition, he inherited $4300 from his mother in the spring of 2008, but he stated that, because these two sums amounted to his entire income for the year up to that point, he had spent all of it on past-due bills. These bills included, among other expenses, at least $3500 in back taxes. He testified that the reinstatement of his license would cost him an additional $700 for the required broker's course and other fees. The court found husband "has virtually no money in any bank accounts and his only asset is his 1998 GMC Jimmy truck. At the time of hearing, [husband] owed $300 for [half] of his May rent and had not yet paid the $600 for his June rent. [His] car insurance policy was cancelled but he has since had it reinstated."

¶ 6. Beyond the commission and inheritance income, husband testified that he was incapable of physical labor, having suffered three heart attacks, two angioplasty procedures and a quintuple bypass, and, owing to his age and experience, was "over qualified" for many other jobs. He stated that he expected to receive around $3000 in June as part of a regular side job he had writing articles for various golfing magazines, but he planned to spend much of this money on other late bills.

¶ 7. Following the hearing, the court found husband had chosen to remain unable to pay the child support obligation and held him in contempt of court. The court ruled that husband's suspended license did not justify relieving him of child support payments. The court reasoned that because he had willfully and intentionally created this inability to pay (by engaging in unprofessional conduct), he should not benefit from it. The court additionally found that husband was choosing to remain underemployed by not seeking alternative employment on the theory that he was "over qualified" and would not be hired. Accordingly, on June 25, 2008, the court issued a purge order requiring husband to pay $2800 by July 31, 2008, to avoid the contempt charge. Upon his failure to pay this amount by the date due per the family court's order, OCS filed an affidavit of noncompliance and the court issued a mittimus on August 18, 2008, ordering husband incarcerated until he paid the purge amount. Husband timely appealed.

¶ 8. Husband claims the family court erred by: (1) issuing a purge of contempt order without finding husband had a present ability to pay the purge amount; (2) refusing to stay the purge order; (3) issuing a mittimus without holding a hearing to determine whether husband's noncompliance with the purge order was justifiable; and (4) citing a public policy justification for incarcerating husband to coerce payment of child support even after the supported children had reached the age of majority. Because we agree the court erred in ordering incarceration without a finding that husband had a present ability to pay a purge order, we reverse.

¶ 9. When reviewing a contempt order, this Court will not disturb a trial court's finding of contempt unless discretion was "entirely withheld or was exercised on grounds clearly untenable." *Mayo v. Mayo*, 173 Vt. 459, 462, 786 A.2d 401, 406 (2001) (mem.) (quotation omitted). Under 15 V.S.A. § 603, "[a] person who disobeys a lawful order or decree of a court . . . may be proceeded against for contempt." When a family court finds a party in noncompliance with a valid, enforceable order, it "may exercise its discretion to impose sanctions for contempt." *Hunt v. Hunt*, 162 Vt. 423, 436, 648 A.2d 843, 853 (1994). In finding contempt for nonpayment of child support due to financial inability, however, "the court must find a *present ability* to pay before the defendant may be found in contempt." *Id.* (emphasis added) (citing *Steele v. Steele*, 142 Vt. 112, 114, 453 A.2d 400, 401 (1982)); accord *Mayo*, 173 Vt. at 462, 786 A.2d at 406.

¶ 10. A factual finding of a present ability to pay is critical when a party's liberty interests are at stake. "When the issuance of a mittimus is conditioned upon the happening of an out-of-court event [like the nonpayment of a purge order], the contemnor is entitled to be heard on the facts relating to this event." *Allen v. Smith*, 126 Vt. 546, 548, 237 A.2d 354, 355 (1967).

¶ 11. The "decisive characteristic of [incarceration for] civil contempt" is the ability of the contemnor to "purge[] himself of such contempt by complying with the order." *Id.* (citing *Maggio v. Zeitz*, 333 U.S. 56 (1948)). This is because a finding of civil contempt and the resulting sanction is meant to force parties' compliance through coercion and not to punish them for misconduct. *Sheehan v. Ryea*, 171 Vt. 511, 512, 757 A.2d 467, 468 (2000) (mem.); *In re Sage*, 115 Vt. 516, 517, 66 A.2d 13, 14 (1949) ("In a criminal contempt the purpose of the commitment is punitive and in

a civil contempt the purpose is coercive."). We have further described it:

> Only compensatory fines or coercive sanctions may be imposed on a civil contemnor, and these must be purgeable, i.e., they must be capable of being avoided by defendants through adherence to the court's order. Thus, it is commonly said that the contemnor holds the keys to the jail and stands committed only until the act required by the court is performed.

*Russell v. Armitage*, 166 Vt. 392, 407-08, 697 A.2d 630, 640 (1997) (Morse, J., concurring) (quotations and citations omitted). Because a party must hold the keys to the jail, when a party lacks the present ability to pay or satisfy the contempt, imprisonment "amount[s] to [a] punishment akin to criminal contempt." *Sheehan*, 171 Vt. at 513, 757 A.2d at 469. Thus, a court cannot rightly order incarceration as a means of coercing compliance if a party lacks the present ability to pay a purge order. *Mayo*, 173 Vt. at 462-64, 786 A.2d at 406-07; *Sheehan*, 171 Vt. at 512-13, 757 A.2d at 468-69.

¶ 12. In ordering the mittimus, the family court relied on the principle that "an obligor, who by his own wrongful conduct places himself in a position that he is no longer available for gainful employment, is not entitled to relief for his child support obligation." The court reasoned that "[i]t was foreseeable that [husband's real estate] license could be suspended when he engaged in the voluntary [unprofessional] conduct at issue" and the loss of his license should thus not provide him with a justification for noncompliance with the underlying child support order. In support of this "no justification rule," the family court cited various cases from sister jurisdictions, all of which deal with parties who owed child support, but had become unable to pay due to their own

incarceration or criminal misconduct.[*] This analysis is not appropriately applied to the circumstances of this case, nor would it support the actions taken by the family court. Regardless of husband's previous actions, the law is clear that a court cannot order incarceration if husband has no present ability to purge himself of contempt. There was no evidence before the court to support a finding husband had the ability to purge the contempt. Rather, the court relied on testimony offered more than two months earlier of an expectation of future income. This was error.

¶ 13. Based on our above-cited precedent and reasoning, we find that the family court exercised its discretion on clearly untenable grounds. Apparently assuming husband's anticipated earnings had been received, the court found money available to pay his arrears. However, because it failed to give husband a hearing, there was no basis upon which the court could find a present ability to pay. Without an ability to purge his contempt, no mittimus should have issued.

*We thus reverse the family court's finding of contempt, vacate the mittimus and remand.*

---

[*] All of the Connecticut cases cited in support were overruled by statute. Conn. Gen. Stat. § 17b-745(a)(5)(B); see *Ballinger v. Wingate*, No. FA970541718, 2004 WL 944801, at *6 (Conn. Super. Ct. Apr. 7, 2004) ("Public Act No. 03-258 [codified, in part, at § 17b-745] legislatively overruled these cases and moved Connecticut into the 'complete justification' column.").