Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/13/2016 09:06 AM CDT

Madeline Loretta Sickler, now known as
Madeline Loretta Schmitz, appellee, v.
Steven Dale Sickler, appellant.

___ N.W.2d ___

Filed May 13, 2016.    No. S-15-594.

1. **Contempt: Appeal and Error.** In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion.

2. **Contempt.** Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party.

3. **Contempt: Words and Phrases.** Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order.

4. **Contempt: Proof: Presumptions.** Outside of statutory procedures imposing a different standard or an evidentiary presumption, the complainant must prove all elements of contempt by clear and convincing evidence.

5. **Contempt.** Contempt proceedings may both compel obedience to orders and administer the remedies to which a court has found the parties to be entitled.

6. **Courts: Restitution: Contempt.** Through its inherent powers of contempt, a court may order restitution for damages incurred as a result of failure to comply with a past order.

7. **Courts: Jurisdiction: Divorce: Contempt.** A court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief in a contempt proceeding.

8. **Courts: Equity.** Where a situation exists which is contrary to the principles of equity and which can be redressed within the scope

of judicial action, a court of equity will devise a remedy to meet the situation.

9. **Constitutional Law: Debtors and Creditors.** With the passage of Neb. Const. art. I, § 20, Nebraska put an end to the ancient practice of seizing the person of a debtor as a means of coercing payment of a debt.

10. **Debtors and Creditors: Words and Phrases.** Whether an obligation is a "debt" depends on the origin and nature of the obligation and not on the manner of its enforcement.

11. \_\_\_\_: \_\_\_\_. "Debt," as stated in state constitutional prohibitions of imprisonment for debt, is generally viewed as an obligation to pay money from the debtor's own resources, which arose out of a consensual transaction between the creditor and the debtor.

12. **Divorce: Property Division: Constitutional Law: Contempt: Debtors and Creditors.** Contempt for noncompliance with a property division award in a dissolution decree does not originate in an action for the collection of debt, or from an obligation, through a consensual transaction between the creditor and the debtor, to pay money from the debtor's own resources. Therefore, enforcement, through contempt, of a property division does not violate Neb. Const. art. I, § 20.

13. **Courts: Criminal Law.** A court can impose criminal, or punitive, sanctions only if the proceedings afford the protections offered in a criminal proceeding.

14. **Contempt: Sentences.** A civil sanction is coercive and remedial; the contemnors carry the keys of their jail cells in their own pockets, because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance.

15. **Criminal Law: Contempt: Sentences.** A criminal sanction is punitive; the sentence is determinate and unconditional, and the contemnors do not carry the keys to their jail cells in their own pockets.

16. **Contempt.** The ability to comply with a contempt order marks a dividing line between civil and criminal contempt.

17. \_\_\_\_. In order for the punishment to retain its civil character, the contemnor must, at the time the sanction is imposed, have the ability to purge the contempt by compliance and either avert punishment or, at any time, bring it to an end.

18. **Contempt: Sentences.** A present inability to comply with a contempt order is a defense, not necessarily to contempt, but to incarceration.

19. **Constitutional Law: Criminal Law: Contempt: Sentences.** An incorrect decision on the ability to comply with a contempt order—the critical factor dividing civil from criminal contempt—increases the risk of wrongful incarceration by depriving the defendant of the procedural protections that the Constitution would demand in a criminal proceeding.

20. **Contempt: Sentences: Due Process.** Prospectively, a court that imposes incarceration as part of civil contempt proceedings shall make express findings regarding the contemnor's ability to comply with the purge order, in order to avoid inadvertent violations of due process rights and for consistency of procedure for both represented and nonrepresented indigent contemnors.

21. **Contempt: Sentences: Proof.** It is the contemnor who has the burden to assert and prove the inability to comply with the contempt order to avoid incarceration or to purge himself or herself of contempt.

22. **Contempt: Sentences: Evidence.** A contemnor may defend against incarceration under a civil contempt order, but only upon a showing of such inability by a preponderance of the evidence; that showing entails attempts to exhaust all resources and assets or borrow sufficient funds and the inability to thereby secure the funds to comply with the purge order.

23. **Contempt: Evidence.** The contemnor is in the best position to know whether the ability to pay is a consideration, and he or she has the best access to the evidence on the issue.

24. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

25. **Criminal Law: Contempt: Sentences: Time.** When a contemnor is required to serve a determinate sentence after a specified date if compliance has not occurred by that date, and there is no provision for discharge thereafter by doing what the contemnor had previously refused to do, then the sentence is punitive as of that date.

26. **Contempt: Sentences: Time.** In the case of civil contempt involving the use of incarceration as a coercive measure, a court may impose a determinate sentence only if it includes a purge clause that continues so long as the contemnor is imprisoned.

Appeal from the District Court for Buffalo County: MARK J. YOUNG, Judge. Affirmed as modified.

Kent A. Schroeder, of Ross, Schroeder & George, L.L.C., for appellant.

Marsha E. Fangmeyer, of Knapp, Fangmeyer, Aschwege, Besse & Marsh, P.C., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, STACY, and KELCH, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Steven Dale Sickler appeals from an order of contempt sanctioning him with a determinate period of 90 days' incarceration if, within 17 days, he did not pay $37,234.84 to his ex-wife, Madeline Loretta Sickler, now known as Madeline Loretta Schmitz. The sum in question stems from the property division awarding a percentage of Steven's individual retirement account (IRA) to Madeline. Madeline's percentage had not been transferred to her in the 14 years since the decree. Due to withdrawals by Steven, of which Madeline was unaware, the account no longer contains sufficient funds to satisfy the award.

Steven argues that the order of contempt is an imprisonment for debt in violation of article I, § 20, of the Nebraska Constitution. He also argues that the period of 17 days to purge the contempt was unreasonable. The contempt and sanctions order was stayed on condition that Steven file an appearance bond, and Steven argues the requirement of an appearance bond also violates article I, § 20, of the Nebraska Constitution.

## II. BACKGROUND

### 1. DISSOLUTION DECREE

Madeline and Steven were divorced in April 2001. As part of the property division, the court awarded to Madeline 18.6 percent of an IRA held under Steven's name. The dissolution decree listed the amount of the award to Madeline as $45,786. The court denied the "request to reduce retirement benefits for either party by anticipated but nevertheless speculative tax consequences."

The total balance for the IRA account in April 2001 was $305,587.44. The court's order made no reference to the need for a qualified domestic relations order (QDRO) with respect to the IRA.

Steven moved for a new trial. As a result of the motion, the court adjusted the award of the IRA by decreasing Madeline's

award by $3,100 and increasing Steven's award by $3,100. Steven appealed the order but later dismissed his appeal.

### 2. OCTOBER 2004 NEGOTIATIONS

Nothing occurred until October 2004, when Madeline called Steven about the fact that her percentage of the IRA still needed to be transferred to her. Madeline had apparently been confused about how to proceed with the transfer. Steven sent a letter to Madeline stating that the reason she had not received her share of the retirement account is that her attorney failed to file a QDRO. Steven recognized Madeline's share of the retirement account was $45,786 and offered several options for payment that were amenable to him. He wished to avoid attorney fees. He mentioned opening and reassessing all life insurance and retirement plans listed on the property statement attached to the dissolution decree. He wanted credit for student loans he had incurred on behalf of their children since the decree.

### 3. OCTOBER 2005 QDRO

Madeline did not accept any of Steven's proposals for payment. A QDRO was filed in October 2005. It stated that the dollar amount of benefits to be paid to Madeline was 18.6 percent of Steven's share of the IRA as of April 25, 2001, the date of the decree of dissolution.

### 4. MOTION TO SET ASIDE QDRO

Steven moved to set aside the QDRO on the ground that the amount stated in the QDRO was inconsistent with the dissolution decree as revised after the motion for new trial. At the hearing on the motion, Steven's counsel complained that the QDRO should have been sought sooner.

### 5. APRIL 2006 ORDER REGARDING NEED FOR NEW QDRO

On April 18, 2006, the court vacated the QDRO filed in October 2005. It explained that the matter was before the

court "because of the failure of one or both parties to submit a [QDRO] at the time the Court entered its amended decree" of dissolution. The court found that a new QDRO should be drafted and submitted by Madeline's counsel, subject to Steven's approval as to form and content.

The court then made the following findings:

First the final decree entered by the Court awarding a percentage of an IRA to each party means exactly what is set forth in the Court's order. Each party being awarded a percentage of a particular asset then shares in the potential for gain or loss associated with that asset from the date of division. The Court's quantifying the value of the percentage of the asset is solely for the purpose of insuring that an equitable division of the property occurred and is not intended to be an award of a dollar value to a particular party.

As such, the Court finds that [Madeline's] current share of the IRA, upon division, is the original market value of the asset plus or minus the performance of that portion of the asset since the order of division, the final journal entry.

### 6. Motion for Order to Show Cause

On June 6, 2006, Madeline moved for an order to show cause why Steven should not be held in contempt for violating the terms of the September 2001 dissolution decree by withdrawing a total of $209,980 from the IRA.

### 7. June 2006 Hearing

A hearing was held on June 28, 2006, for the purposes of conducting an evidentiary hearing with regard to the proposed revised QDRO and the current value of the IRA, and to determine facts relevant to Madeline's motion to show cause.

At the hearing, it was discovered that Steven had made the following withdrawals from the IRA since the dissolution decree, leaving the IRA with inadequate funds to cover the property division award: $30,000 in August 2001, $10,000 in

March 2002, $40,000 in April 2002, $20,000 in July 2002, $30,000 in August 2002, and $79,980 in January 2005. After the January 2005 withdrawal, the IRA account was left with a balance of $13,115.25. By September 2005, the balance was $4,748.18. Steven testified that that was the approximate balance as of the date of the hearing. The difference between the balance after the withdrawal in January and the balance in September is apparently due to fluctuations within the investments making up the IRA. The IRA had depreciated due to market fluctuations by about $90,000 since the time of the dissolution decree.

Steven admitted that he made these withdrawals with the knowledge that Madeline was awarded a percentage of the IRA. Steven testified that he made no attempts to discern whether Madeline had transferred her portion of the IRA out of his accounts prior to making the withdrawals.

Madeline testified that she did not attempt to obtain her share of the IRA directly from the bank, noting that the account was in Steven's name. She did not know that Steven was making withdrawals from the IRA account.

### 8. July 2006 Contempt Order

The court found that Steven knew in October 2004, before withdrawing approximately $80,000 from the IRA account, that Madeline had not received her moneys from the account, as required by the dissolution decree. The court reasoned that such knowledge was clearly indicated in Steven's letter to Madeline in October 2004.

In an order dated July 10, 2006, the court found that "depletion of the account by [Steven] with knowledge of the nonpayment to [Madeline] clearly places [Steven] in contempt of court for willfully violating the court's order requiring that [Madeline] receive her proceeds from the account." Steven was ordered to pay Madeline $37,234.84. The court explained that this amount represented 17.34 percent of all moneys taken by Steven from the account and 17.34 percent of the account balance.

### 9. AUGUST 2006 MOTION FOR
### FURTHER SANCTIONS

On August 24, 2006, Madeline filed a motion for an order imposing further contempt sanctions for the reason that Steven had failed to comply with the July 2006 order to pay Madeline $37,234.84.

### 10. MAY 2007 ASSIGNMENT OF
### EXPECTED LAWSUIT PROCEEDS

On May 15, 2007, Steven assigned to Madeline a pro rata share, not to exceed $37,234.84, of whatever proceeds Steven received as a result of litigation he had filed. In exchange, Madeline agreed to forbear from pursuing her motion for further sanctions against Steven. Steven's litigation involved claims of malpractice against a law firm and an attorney from another law firm, arising out of alleged negligence in performing the "legal background for the franchises" Steven owned. As a result of the alleged negligence, 15 lawsuits had been filed against Steven for 15 out of the 21 franchises he had sold.

### 11. LAWSUITS END WITH NO
### PAYMENT TO MADELINE

The lawsuit against the law firm eventually settled for $2.2 million. The lawsuit against the attorney went to trial and resulted in a verdict in the attorney's favor. However, according to Steven, $1.2 million of the settlement with the law firm went to attorney fees and all remaining funds from the settlement were consumed by the liens against him as a result of the underlying suits relating to the 15 franchises. Steven claimed that he still had outstanding judgments against him. No payment was made to Madeline pursuant to the assignment.

### 12. APRIL 2014 STIPULATION
### FOR REPAYMENT PLAN

In April 2014, Madeline and Steven jointly filed a stipulation for a repayment plan whereby Steven would fulfill his

obligation to pay $37,234.84 by paying $6,000 "at the end of each sixth month period" over a 4-year period, with an interest rate of 2 percent on the outstanding balance.

In an order entered April 3, 2014, the court approved the stipulation and ordered the parties to comply with the terms thereof. The court explained that the matter was before it due to Steven's failure to comply with a court order that he pay Madeline $37,234.84. Pursuant to the stipulation, Madeline's motion for further sanctions was dismissed without prejudice.

### 13. FEBRUARY 2015 MOTION FOR FURTHER SANCTIONS AND HEARING

In February 2015, Madeline filed a new motion for further sanctions due to the failure to make any payments under the stipulation for repayment plan. A hearing was held on the motion.

At the hearing on the motion, Steven's attorney argued that the IRA was not subject to the federal Employee Retirement Income Security Act of 1974 and that thus, a QDRO was never required in order for Madeline to transfer her share out of the account. The implication was that Madeline wasted a lot of time obtaining a QDRO that was never required.

Steven's attorney also asserted that the July 2006 order directing Steven to pay $37,234.84 to Madeline is "clearly contrary" to the court's April 2006 order pertaining to drafting a new QDRO. This argument was apparently based on the assertion that the April 2006 order was "quantifying the value of the percentage of the asset" "solely for the purpose of ensuring that an equitable division of the property occurred" and was "not intended to be an award of a dollar value to a particular party."

Steven testified that he did not make any payments under the 2014 stipulation because a contract to work in Newfoundland, Canada, earning $370,000 per year, fell through. Steven also explained that he believed the stipulation "sidesteps the laws

of the IRS," because direct payments to Madeline allowed her to avoid early withdrawal penalties. Lastly, Steven explained that he did not pay under the stipulation because Madeline's attorney allegedly "lied to the Judge" about Steven's depleting the IRA account, insofar as he had originally "never touched that account that made up 25 percent of the value of it."

Madeline adduced testimony concerning Steven's income in the years since the 2006 contempt order. Steven testified that he was employed in 2006, running his own franchise business. After that, he was unemployed for about a year. He then obtained a job as a sales manager for an electric company, earning $79,000 a year. He worked for that company for about 1½ years before obtaining employment as a project manager for another electric company. He worked there for about 2 years, earning $125,000 per year. In 2013, Steven obtained a 1-year contract with an engineering and construction company as a construction manager, under which contract he earned $287,000. After the contract in Newfoundland fell through, he was unemployed for 2 months. He then worked as a project manager for an engineering company, earning $150,000 per year.

There was a 6-week gap between the 1-year contract with the engineering and construction company and his employment at the time of the hearing. He was working as a contractor and was being paid $60 per hour. He was anticipating employment with another company, to begin in 2 weeks. He expected to work as a construction manager earning $145,000 per year. His expectation was that he would be working there long term.

Steven owned his home, but it was mortgaged. It was unclear whether there was any equity in the home. He owned a car, but it was unclear what liens were on the car. Steven admitted that he had made no payments to comply with the July 2006 order. Nor had he made any payments under the stipulated payment plan.

### 14. June 2015 Order of Contempt
### and Sanctions

In an order dated June 8, 2015, the court found that Steven was still in contempt. The court ordered that, as further sanctions, he must report on June 15 to serve a sentence of 90 days' incarceration.

The sentence could be purged by payment in full of the sum of $37,234.84 to Madeline on or before June 15, 2015. If Steven failed to report on June 15, or failed to pay the sum owed Madeline before that date, a bench warrant would be issued for his arrest.

The order stated:

> [T]he Court . . . finds that [Steven] is still in contempt and as further sanctions, he shall report to the Buffalo County Detention Center on June 15, 2015 at 9:00 a.m. to serve a sentence of ninety (90) days incarceration. Said sentence may be purged by payment in full of the monies owed to [Madeline], the sum of $37,234.84, *on or before June 15, 2015*.
>
> If [Steven] fails to report to the Buffalo County Detention Center on June 15, 2015 or fails to pay the sum owed to [Madeline] on or before that date, a bench warrant will be issued for his arrest.

(Emphasis supplied.)

At the hearing, the court had reasoned, "[Steven] may have had some setbacks, and it certainly sounds like a course of setbacks during the last eight years, but it's not like he wasn't given an opportunity to purge by simply paying the money." The court also noted that it did not find particularly relevant what Madeline may or may not have known or done about transferring out her share of the IRA account before Steven depleted the funds. The court did not make any specific findings regarding Steven's ability to pay a lump sum of $37,234.84 within the timeframe specified by the order.

### 15. Motion to Stay Granted

On June 15, 2015, the court granted Steven's motion to stay the contempt and sanctions order. The stay was subject to Steven's posting a surety bond in the amount of $25,000 within 30 days of June 8, 2015, or his appearance to the jail on further order of the court. Steven filed the appearance bond on June 19.

### 16. Appeal Filed

On July 2, 2015, Steven filed his notice of appeal of the June 8 order imposing further sanctions.

## III. ASSIGNMENTS OF ERROR

Steven assigns that the district court abused its discretion in (1) finding Steven to be in civil contempt; (2) imposing an unreasonable, arbitrary, capricious, and punitive sentence; (3) setting parameters for Steven to purge himself that were impossible to perform; and (4) requiring Steven to post an appearance bond.

## IV. STANDARD OF REVIEW

[1] In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which the trial court's (1) resolution of issues of law is reviewed de novo, (2) factual findings are reviewed for clear error, and (3) determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion.[1]

## V. ANALYSIS

[2-4] This is an appeal from an order imposing further sanctions for civil contempt in relation to a dissolution decree. Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party

---

[1] See *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

fails to comply with a court order made for the benefit of the opposing party.[2] Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order.[3] Outside of statutory procedures imposing a different standard or an evidentiary presumption, the complainant must prove all elements of contempt by clear and convincing evidence.[4]

[5-8] Contempt proceedings may both compel obedience to orders and administer the remedies to which a court has found the parties to be entitled.[5] Through its inherent powers of contempt, a court may order restitution for damages incurred as a result of failure to comply with a past order.[6] And a court's continuing jurisdiction over a dissolution decree includes the power to provide equitable relief in a contempt proceeding.[7] Where a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation.[8]

In its 2006 order of contempt, the court found that Steven willfully violated the dissolution decree when he depleted the funds of the IRA within 3 months of being informed by Madeline that she had not yet received her share of the IRA that was awarded to her. Recognizing that a rollover of funds directly from Steven's IRA into Madeline's IRA was no longer possible, the court devised that appropriate restitution for the

---

[2] See, *id.*; *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh, supra* note 1.

[3] See *Hossaini v. Vaelizadeh, supra* note 1.

[4] See, *id.*; *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2.

[5] See *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2.

[6] See *id.*

[7] See *id.*

[8] *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006).

dissipation of the IRA account was payment to Madeline of the sum of $37,234.84. Steven has delayed the imposition of any further sanctions for contempt by assignment of the proceeds from a lawsuit and a stipulation for payments. No payments have been made to Madeline in the 9 years since the 2006 contempt order. In 2015, the court ordered imprisonment as a further sanction for Steven's continuing civil contempt. Steven makes several arguments attacking the validity of that order.

## 1. PROHIBITION OF IMPRISONMENT FOR DEBT

[9] Steven's principal contention is that imprisonment for failing to pay restitution of funds that were awarded to an ex-spouse in a dissolution decree is imprisonment for debt in violation of article I, § 20, of the Nebraska Constitution. Article I, § 20, states, "No person shall be imprisoned for debt in any civil action on mesne or final process." With the passage of article I, § 20, Nebraska put an end to the "ancient practice of seizing the person of a debtor as a means of coercing payment of a debt."[9]

[10] Most courts do not allow "nonpayment contempt," which is the use of the court's contempt power to threaten a debtor with imprisonment for failure to comply with a court order to turn money or property over to creditors.[10] The courts find such contempt orders violate constitutional prohibitions of imprisonment for debt. Whether an obligation is a "debt" depends on the origin and nature of the obligation and not on the manner of its enforcement.[11]

---

[9] *Rosenbloom v. State*, 64 Neb. 342, 346, 89 N.W. 1053, 1054 (1902).

[10] Lea Shepard, *Creditors' Contempt*, 2011 BYU L. Rev. 1509, 1543 (2011). See, 16B Am. Jur. 2d *Constitutional Law* § 680 (2009); 17 C.J.S. *Contempt* § 185 (2011). See, also, e.g., *Carter v. Grace Whitney Properties*, 939 N.E.2d 630 (Ind. App. 2010); *In re Byrom*, 316 S.W.3d 787 (Tex. App. 2010).

[11] 16A C.J.S. *Constitutional Law* § 813 (2015).

[11] The definition of "debt," for the purposes of constitutional prohibitions of imprisonment for debt, means more than just a specific sum of money due or owing from one to another.[12] "Debt," as stated in state constitutional prohibitions of imprisonment for debt, is generally viewed as an obligation to pay money from the debtor's own resources, which arose out of a consensual transaction between the creditor and the debtor.[13] Thus, the prohibition applies to money directly due under a contract, to judgment debt arising from contractual debts, to attempts to specifically enforce creditor-debtor agreements, and to damages for breach of any form of contractual obligation.[14]

[12] In *Rosenbloom v. State*,[15] we said that Neb. Const. art. I, § 20, "means just what it says, and, when considered in the light of familiar history, it seems hardly possible to misunderstand it. It deals only with procedure in civil actions,—actions having for their object the collection of debts." As we will explain in more detail, we agree with Madeline that contempt for noncompliance with a property division award in a dissolution decree does not originate in an action for the collection of debt, or from an obligation, through a consensual transaction between the creditor and the debtor, to pay money from the debtor's own resources. Therefore, enforcement through contempt of such property division does not violate Neb. Const. art. I, § 20.

It has been said that "debt," as specified in state constitutional prohibitions of imprisonment for debt, does not generally include enforcement of equitable orders.[16] We have held that child support obligations bear no "resemblance whatever

---

[12] *Id.*

[13] *Id.*

[14] 16A C.J.S., *supra* note 11, § 814.

[15] *Rosenbloom v. State, supra* note 9, 64 Neb. at 346, 89 N.W. at 1054.

[16] See 17 Am. Jur. 2d *Contempt* § 205 (2014).

to a debt, and therefore the Constitution does not forbid imprisonment for the defendant's refusal to obey the order of the court" to pay child support.[17] Likewise, we have held that an order of temporary alimony is not debt under article I, § 20, but is instead an order designed to secure the performance of a legal duty in which the public has an interest.[18] We further reasoned that such powers are part of the inherent equity powers of the dissolution court.[19] We have said that attorney fees and costs arising out of a dissolution action are not debt under article I, § 20, on similar grounds.[20]

The courts may, through the exercise of their equitable powers, enforce orders made in dissolution proceedings. We have held that a party may use contempt proceedings to enforce a property settlement agreement incorporated into a dissolution decree. But we have never directly addressed whether a contempt order for failure to abide by a property division runs afoul of the constitutional prohibition against imprisonment for debt, when the court has ordered imprisonment as a sanction.[21] In *Grady v. Grady*,[22] we affirmed a contempt order sentencing the ex-husband to 90 days in jail for diverting funds from stocks awarded to his ex-wife in a dissolution decree. We could have, but did not, notice any plain error with regard to the order of incarceration. *Grady* implicitly stands for the proposition that obligations arising out of the property division in a dissolution action are not debt under article I, § 20, of the Nebraska Constitution.

---

[17] *Fussell v. State*, 102 Neb. 117, 166 N.W. 197, 199 (1918).

[18] *Cain v. Miller*, 109 Neb. 441, 191 N.W.2d 704 (1922).

[19] See *id.*

[20] *Jensen v. Jensen*, 119 Neb. 469, 229 N.W. 770 (1930).

[21] See, *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2; *Novak v. Novak*, 245 Neb. 366, 513 N.W.2d 303 (1994), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2; *Grady v. Grady*, 209 Neb. 311, 307 N.W.2d 780 (1981).

[22] *Grady v. Grady, supra* note 21.

We now expressly hold what we implied in *Grady*—that imprisonment for contempt for the failure to comply with the order of property division in a dissolution decree does not violate article I, § 20, of the Nebraska Constitution.

Many other jurisdictions similarly hold that imprisonment under contempt proceedings relating to a property division award does not violate state constitutional prohibitions of imprisonment for debt.[23]

We agree with the reasoning of these courts that property divisions in dissolution decrees arise from the existence of the marital status, and not from a business transaction; thus, property divisions are "state concerns."[24] The public interest treats property divisions in dissolution decrees as equitable determinations of the rights and obligations of the marital couple to

---

[23] See, *White v. Taylor*, 19 Ark. App. 104, 717 S.W.2d 497 (1986); *Harvey v. Harvey*, 153 Colo. 15, 384 P.2d 265 (1963); *Froehlich v. Froehlich*, 297 Ga. 551, 775 S.E.2d 534 (2015); *Phillips v. District Court of Fifth Judicial District*, 95 Idaho 404, 509 P.2d 1325 (1973); *In re Marriage of Lenger*, 336 N.W.2d 191 (Iowa 1983); *Switzer v. Switzer*, 460 So. 2d 843 (Miss. 1984); *Cobb v. Cobb*, 54 N.C. App. 230, 282 S.E.2d 591 (1981); *Harris v. Harris*, 58 Ohio St. 2d 303, 390 N.E.2d 789 (1979); *Sinaiko v. Sinaiko*, 445 Pa. Super. 56, 664 A.2d 1005 (1995); *Hanks v. Hanks*, 334 N.W.2d 856 (S.D. 1983); *Kanzee v. Kanzee*, 668 P.2d 495 (Utah 1983); *Decker v. Decker*, 52 Wash. 2d 456, 326 P.2d 332 (1958); *Schroeder v. Schroeder*, 100 Wis. 2d 625, 302 N.W.2d 475 (1981). See, also, *Dowd v. Dowd*, 96 Conn. App. 75, 899 A.2d 76 (2006); *In re Marriage of Wiley*, 199 Ill. App. 3d 223, 556 N.E.2d 788, 145 Ill. Dec. 170 (1990); *Wisdom v. Wisdom*, 689 S.W.2d 82 (Mo. App. 1985); *Lamb v. Lamb*, 848 P.2d 582 (Okla. App. 1992); *Brooks v. Brooks*, 277 S.C. 322, 286 S.E.2d 669 (1982). But see, *Johnson v. Johnson*, 22 Ariz. App. 69, 523 P.2d 515 (1974); *Kadanec v. Kadanec*, 765 So. 2d 884 (Fla. App. 2000); *Kimbrell v. Secrist*, 613 N.E.2d 451 (Ind. App. 1993); *Haughton v. Haughton*, 319 Md. 460, 573 A.2d 42 (1990); *Guynn v Guynn*, 194 Mich. App. 1, 486 N.W.2d 81 (1992); *Burgardt v. Burgardt*, 474 N.W.2d 235 (Minn. App. 1991); *Hall v. Hall*, 114 N.M. 378, 838 P.2d 995 (N.M. App. 1992); *Dvorak v. Dvorak*, 329 N.W.2d 868 (N.D. 1983).

[24] See, e.g., *Phillips v. District Court of Fifth Judicial District, supra* note 23; *Haley v. Haley*, 648 S.W.2d 890 (Mo. App. 1982); *Oedekoven v. Oedekoven*, 538 P.2d 1292 (Wyo. 1975).

one another. The division of marital accumulations as a result of joint efforts and economies is treated no differently than alimony.[25] The obligations are not money owed as a debt, but are instead "status obligations"—what we consider to be the equitable division of property acquired during the marriage.[26]

We also find persuasive the reasoning that orders enforcing the division of property under a dissolution action are merely requiring the contemnor to surrender property that already belongs to the ex-spouse, likening the contemnor to a constructive trustee rather than a debtor.[27] The court is not ordering the contemnor to pay money out of his or her own resources, but is merely mandating that the person return the other person's resources that resided in the marital estate.[28]

We find no merit to Steven's contention that, because the contempt stems from a property division in a dissolution decree, incarceration as a sanction for the contempt runs afoul of our constitutional prohibition of imprisonment for debt. We similarly find no merit to Steven's contention that the appearance bond violated article I, § 20.

## 2. Willfulness

Steven's next argument appears to be that the court erred in finding his conduct to be willful. Steven argues that through the contempt order, he was being "blamed for the failure of [Madeline] to segregate the IRA into two different accounts."[29] Steven points out that it took Madeline over 4 years to obtain a QDRO and that, because the IRA is not a financial account governed by the Employee Retirement Income Security Act, division of an IRA can be accomplished simply by presenting

---

[25] See *Harris v. Harris, supra* note 23.

[26] See, *id.*; Richard E. James, *Putting Fear Back Into the Law and Debtors Back Into Prison: Reforming the Debtors' Prison System*, 42 Washburn L.J. 143 (2002).

[27] See *Ex parte Gorena*, 595 S.W.2d 841 (Tex. 1979).

[28] See *In re Estate of Downs*, 300 S.W.3d 242 (Mo. App. 2009).

[29] Brief for appellant at 5.

the dissolution decree to the issuer of the IRA. This argument equates with a claim that leaving the money in Steven's control caused him to take the money that belonged to Madeline. This argument has no equitable basis and is clearly without merit.

We find no error in the court's finding that Steven willfully violated the dissolution decree. Without Madeline's or the dissolution court's knowledge, Steven made numerous withdrawals from the IRA. He made one withdrawal in 2001 of $30,000. In 2002, he made four withdrawals in increments of $10,000, $20,000, $30,000, and $40,000. The sum total of the withdrawals in 2002 and 2003 left the IRA with insufficient funds to satisfy the dissolution decree.

But within 3 months of Madeline's 2005 inquiries about finally transferring her share of the IRA to an account in her name, Steven made his largest single withdrawal, $79,980, which reduced the amount of the IRA to a level grossly insufficient to satisfy the property division award. The court did not err in finding that at the time of this withdrawal, Steven was aware that Madeline's share of the IRA account had not yet been transferred to her possession. The court did not err in finding that in 2005, Steven acted willfully when he withdrew moneys from the IRA account, which by virtue of the dissolution decree belonged to Madeline.[30]

We note that the issue of Steven's willfulness would ordinarily be considered the law of the case from the time of the June 2006 order, which was not appealed. The law of the case doctrine reflects the principle that an issue that has been litigated and decided in one stage of a case should not be relitigated at a later stage.[31] As we stated in *Smeal Fire Apparatus Co. v. Kreikemeier*,[32] an order of contempt in a postjudgment proceeding to enforce a previous final judgment is a final order, because it affects substantial rights and is made upon

---

[30] See *Hossaini v. Vaelizadeh, supra* note 1.

[31] *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2.

[32] *Id.*

a summary application after judgment. But the 2006 order was issued before our decision in *Smeal Fire Apparatus Co*. And, before that opinion, our case law held that civil contempt orders were not final orders and could be challenged only in habeas corpus proceedings.[33] We conclude the court did not err in finding Steven acted willfully.

Steven's allegations that Madeline should have withdrawn the funds earlier do not negate his willful disobedience of a decree that clearly awarded these funds to Madeline. Any inference of laches or any other equitable defense to his dissipation lacks any merit, and Steven could not be said to have come to the court with clean hands.[34]

### 3. Criminal Versus Civil Contempt

Lastly, Steven argues that the 17-day period, in which he must raise the $37,234.84 or else suffer 90 days' incarceration as further sanction for his continuing contempt, is unreasonable. Steven argues there was insufficient evidence that he would be able to pay that lump sum within the time period provided in the order and, thus, that he did not have the keys to his own jail cell.[35]

While we agree that the present ability to comply with the purge provision was essential for the order to retain its civil character in these civil proceedings, it was Steven's burden to raise and prove his inability to comply. Steven did not meet that burden.

[13-15] A court can impose criminal, or punitive, sanctions only if the proceedings afford the protections offered in a criminal proceeding.[36] A criminal or punitive sanction is invalid

---

[33] See, e.g., *Allen v. Sheriff of Lancaster Cty.*, 245 Neb. 149, 511 N.W.2d 125 (1994); *Dunning v. Tallman*, 244 Neb. 1, 504 N.W.2d 85 (1993); and *Maddux v. Maddux*, 239 Neb. 239, 475 N.W.2d 524 (1991) (cases overruled by *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2).

[34] See *Olsen v. Olsen*, 265 Neb. 299, 657 N.W.2d 1 (2003).

[35] See *Allen v. Sheriff of Lancaster Cty., supra* note 33.

[36] *Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2.

if imposed in a proceeding that is instituted and tried as civil contempt, because it lacks the procedural protections that the Constitution would demand in a criminal proceeding.[37] A civil sanction is coercive and remedial; the contemnors ""'"carry the keys of their [jail cells] in their own pockets,"'"[38] because the sentence is conditioned upon continued noncompliance and is subject to mitigation through compliance.[39] In contrast, a criminal sanction is punitive; the sentence is determinate and unconditional, and the contemnors do not carry the keys to their jail cells in their own pockets.

## (a) Present Ability to Comply

[16-18] We have recognized that when a purge order involves payment of money, the sum required to purge oneself of contempt must be within the contemnor's *present* ability to pay, taking into consideration the assets and financial condition of the contemnor and his or her ability to raise money.[40] Otherwise, the contempt becomes punitive rather

---

[37] See, *Turner v. Rogers*, 564 U.S. 431, 131 S. Ct. 2507, 180 L. Ed. 2d 452 (2011); *In re Contempt of Sileven*, 219 Neb. 34, 361 N.W.2d 189 (1985), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier, supra* note 2. See, also, e.g., *Hicks v. Feiock*, 485 U.S. 624, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988); *Shillitani v. United States*, 384 U.S. 364, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966).

[38] *Hicks v. Feiock, supra* note 37, 485 U.S. at 633.

[39] See, *Hicks v. Feiock, supra* note 37; *Maddux v. Maddux, supra* note 33.

[40] See, *Allen v. Sheriff of Lancaster Cty., supra* note 33; *Maddux v. Maddux, supra* note 33. See, also, *In re Lawrence*, 279 F.3d 1294 (11th Cir. 2002); *In re Falck*, 513 B.R. 617 (S.D. Fla. 2014); *Taylor v. Johnson*, 764 So. 2d 1281 (Ala. Civ. App. 2000); *McVay v. Johnson*, 727 P.2d 416 (Colo. App. 1986); *Ponder v. Ponder*, 438 So. 2d 541 (Fla. App. 1983); *Jones v. State*, 351 Md. 264, 718 A.2d 222 (1998); *Gonzalez v Gonzalez*, 121 Mich. App. 289, 328 N.W.2d 365 (1982); *Newell v. Hinton*, 556 So. 2d 1037 (Miss. 1990); *Calloway v. Calloway*, 406 Pa. Super. 454, 594 A.2d 708 (1991); *In re Gawerc*, 165 S.W.3d 314 (Tex. 2005); *Krochmalny v. Mills*, 186 Vt. 645, 987 A.2d 318 (2009); *In re King*, 110 Wash. 2d 793, 756 P.2d 1303 (1988); *State, Dept. of Family Services v. Currier*, 295 P.3d 837 (Wyo. 2013); 27C C.J.S. *Divorce* § 1132 (2005).

than coercive.[41] As the U.S. Supreme Court said in *Turner v. Rogers*,[42] it is the ability to comply with a contempt order that marks a dividing line between civil and criminal contempt. In order for the punishment to retain its civil character, the contemnor must, *at the time the sanction is imposed*, have the ability to purge the contempt by compliance and either avert punishment or, at any time, bring it to an end.[43] A present inability to comply with a contempt order is a defense, not necessarily to contempt, but to incarceration.[44]

A past ability to comply with an order does not show a present ability to purge the contempt.[45] Accordingly, while deliberate disposal of financial resources to avoid compliance with an order may be willful behavior justifying a finding of contempt and incarceration under *criminal* contempt proceedings, such a person cannot be incarcerated under a *civil* contempt proceeding unless he or she has the present ability to pay the purge amount when incarcerated.[46] Otherwise, that

---

[41] See *Gonzalez v Gonzalez, supra* note 40.

[42] *Turner v. Rogers, supra* note 37. See, also, e.g., *Hicks v. Feiock, supra* note 37.

[43] See, *Allen v. Sheriff of Lancaster Cty., supra* note 33; *Com. v. Ivy*, 353 S.W.3d 324 (Ky. 2011) (citing *Shillitani v. United States, supra* note 37). See, also, *Turner v. Rogers, supra* note 37; *Hicks v. Feiock, supra* note 37.

[44] *Riser v. Peterson*, 566 So. 2d 210 (Miss. 1990). See, also, *Allen v. Sheriff of Lancaster Cty., supra* note 33; *Com. v. Ivy, supra* note 43; *Turner v. Rogers, supra* note 37; *Hicks v. Feiock, supra* note 37.

[45] See, *Rawlings v. Rawlings*, 362 Md. 535, 766 A.2d 98 (2001); *Howard v. Howard*, 913 So. 2d 1030 (Miss. App. 2005). See, also, *Turner v. Rogers, supra* note 37; *Hicks v. Feiock, supra* note 37; *Allen v. Sheriff of Lancaster Cty., supra* note 33; *Com. v. Ivy, supra* note 43; *Riser v. Peterson, supra* note 44.

[46] See, *Ponder v. Ponder, supra* note 40; *Wells v. State*, 474 A.2d 846 (Me. 1984); *Howard v. Howard, supra* note 45; 27C C.J.S., *supra* note 40. See, also, *United States v. Rylander*, 460 U.S. 752, 103 S. Ct. 1548, 75 L. Ed. 2d 521 (1983).

person does not have the keys to his or her jail cell.[47] Civil contempt is by its very nature inapplicable to one who is powerless to comply with the court order.[48] Only criminal contempt can rely solely on a past ability to comply accompanied by a past refusal to do so.[49]

### (b) Need for Explicit Findings on Present Ability to Comply

[19] In *Turner v. Rogers*, the U.S. Supreme Court held that an indigent defendant in civil contempt proceedings must be appointed counsel or benefit from alternative procedures such as notice, hearing, and use of a form to elicit relevant financial information and that there must be an express finding by the court that the defendant has the ability to pay.[50] The court explained that such procedures are required, because an incorrect decision on the ability to comply with a contempt order—the critical factor dividing civil from criminal contempt—increases the risk of wrongful incarceration by depriving the defendant of the procedural protections that the Constitution would demand in a criminal proceeding.[51]

[20] Given the importance of the ability to comply in distinguishing between civil and criminal contempt and its due process implications, several jurisdictions hold that a court that imposes incarceration as part of civil contempt proceedings

---

[47] See *id.*

[48] *Mayo v. Mayo*, 173 Vt. 459, 786 A.2d 401 (2001). See, also, *Ponder v. Ponder, supra* note 40; *Wells v. State, supra* note 46; *Howard v. Howard, supra* note 45; 27C C.J.S., *supra* note 40. See, also, *United States v. Rylander, supra* note 46.

[49] *Wells v. State, supra* note 46. See, also, *United States v. Rylander, supra* note 46; *Ponder v. Ponder, supra* note 40; *Howard v. Howard, supra* note 45; *Mayo v. Mayo, supra* note 48; 27C C.J.S., *supra* note 40.

[50] *Turner v. Rogers, supra* note 37.

[51] *Id.* See, also, e.g., *Hicks v. Feiock, supra* note 37.

must make express findings regarding the contemnor's ability to comply with the purge order, regardless of whether the contemnor is indigent.[52] We agree that, prospectively, this is the best approach in order to avoid inadvertent violations of due process rights and for consistency of procedure for both represented and nonrepresented indigent contemnors.

### (c) Burden of Production and Persuasion on Contemnor

Steven was represented, and he did not claim to be indigent. This case is somewhat atypical insofar as the finding of contempt came years before the order imposing incarceration as further sanctions for such continuing contempt. More often, an order of incarceration for civil contempt will be contemporaneous with a finding of willfulness, which is at that moment often commensurate to the ability to comply. Given the uniqueness of the facts presented and the fact that our ruling regarding explicit findings on the present ability to comply is prospective only, the court did not commit plain error in failing to sua sponte make findings on Steven's ability to comply at the time of the 2015 order.

[21,22] And Steven did not sufficiently raise and prove the inability to comply as a defense to the order. In *Maddux v. Maddux*,[53] we said it is the contemnor who has the burden to assert and prove the inability to comply with the contempt order to avoid incarceration or to purge himself or herself of contempt. We agree with other courts that have found that a contemnor may defend against incarceration under a civil

---

[52] See, *Wagley v. Evans*, 971 A.2d 205 (D.C. App. 2009); *Bowen v. Bowen*, 471 So. 2d 1274 (Fla. 1985); *In re Adam*, 105 Haw. 507, 100 P.3d 77 (Haw. App. 2004); *Poras v. Pauling*, 70 Mass. App. 535, 874 N.E.2d 1127 (2007); *In re Brown*, 12 S.W.3d 398 (Mo. App. 2000); *Clark v. Gragg*, 171 N.C. App. 120, 614 S.E.2d 356 (2005); *Mundlein v. Mundlein*, 676 N.W.2d 819 (S.D. 2004); *Russell v. Armitage*, 166 Vt. 392, 697 A.2d 630 (1997).

[53] See *Maddux v. Maddux, supra* note 33. See, also, *Liming v. Damos*, 2012 Ohio 4783, 133 Ohio St. 3d 509, 979 N.E.2d 297 (2012).

contempt order, but only upon a showing of such inability by a preponderance of the evidence; that showing entails attempts to exhaust all resources and assets or borrow sufficient funds and the inability to thereby secure the funds to comply with the purge order.[54] The burden of both production and persuasion is on the contemnor. The contemnor must be afforded only the opportunity, before being incarcerated, to demonstrate the inability to comply.

[23] Unlike a showing of willful noncompliance with a prior order at a specific date, it would be particularly difficult for a complainant to bear the burden of establishing the contemnor's financial status on the particular day of an order for incarceration as further sanctions for contempt.[55] And it would be impractical for the court or the complainant to bear the burden of raising and proving the ability to comply during a period of incarceration. The contemnor is in the best position to know whether the ability to pay is a consideration, and he or she has the best access to the evidence on the issue.[56]

Furthermore, a finding of willfulness with regard to the underlying contempt, proved by the complainant by clear and convincing evidence, is sufficient to shift the burden to the

---

[54] See, *Cross v. Ivester*, 315 Ga. App. 760, 728 S.E.2d 299 (2012); *Hughes v. Dept. of Human Resources*, 269 Ga. 587, 502 S.E.2d 233 (1998). See, also, *U.S. v. Butler*, 211 F.3d 826 (4th Cir. 2000); *Huber v. Marine Midland Bank*, 51 F.3d 5 (2d Cir. 1995); *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992); *McMorrough v. McMorrough*, 930 So. 2d 511 (Ala. Civ. App. 2005); *Wagley v. Evans, supra* note 52; *Nab v. Nab*, 114 Idaho 512, 757 P.2d 1231 (Idaho App. 1988); *Com. v. Ivy, supra* note 43; *Jones v. State, supra* note 40; *Newell v. Hinton, supra* note 40; *James Talcott Factors v Larfred, Inc.*, 115 A.D.2d 397, 496 N.Y.S.2d 27 (1985); *In re Mott*, 137 S.W.3d 870 (Tex. App. 2004); *In re King, supra* note 40; *Deitz v. Deitz*, 222 W. Va. 46, 659 S.E.2d 331 (2008). But see, *Bresch v. Henderson*, 761 So. 2d 449 (Fla. App. 2000); *Wells v. State, supra* note 46; *Lambert ex rel. Estate of Lambert v. Beede*, 175 Vt. 610, 830 A.2d 133 (2003).

[55] *Arrington v. Human Resources*, 402 Md. 79, 935 A.2d 432 (2007).

[56] See, *id.*; *State ex rel Mikkelsen v. Hill*, 315 Or. 452, 847 P.2d 402 (1993).

contemnor to show by a preponderance of the evidence an inability to comply, in the event the sanctions for contempt include incarceration.[57]

The contemnor must be given an opportunity to raise the issue of the inability to comply. And, as stated, the court shall in the future also make findings relating to the issue of the ability to comply before the contemnor is incarcerated. But such findings will take into account the fact that the contemnor has the burden to raise and prove this defense.

Given the evidence demonstrating Steven's substantial financial resources and Steven's failure to object on due process grounds below, we find no reversible error based on the argument that the 17-day period in which to garner the funds required to purge the contempt was unreasonable. We find unavailing Steven's assertion that "[n]o reasonable or fair minded person would conclude that [$37,234.84] could be raised in that amount of time unless there was specific evidence that the contemnor had sufficient funds on deposit that could be immediately withdrawn and paid to the court."[58] No such presumption exists isolated from the evidence. He has had over a decade to secure and pay his obligation and, on numerous occasions, has promised payment, including a promise to pay $6,000 in semiannual installments. The time for honoring that promise has come and gone without payment. Steven neither raised nor proved his inability to pay; therefore, the order of incarceration in these civil contempt proceedings did not violate due process on the ground that Steven lacked the ability to obtain $37,234.84 within 17 days. And, because further sanctions were stayed pending this appeal, Steven has been given additional time to acquire the purge amount set forth in the 2006 contempt order and reiterated in the 2015 order for further sanctions.

---

[57] See *Kanzee v. Kanzee, supra* note 23.

[58] Brief for appellant at 10-11.

### (d) Determinate Sentence Without
### Purge Clause Was Plain Error

[24] We find plain error in one important aspect of the district court's 2015 order for further sanctions. The order of incarceration, insofar as it provides no means to purge the contempt after the 90-day period of incarceration goes into effect, is an error plainly evident from the record. By unmistakably imposing a criminal sanction in civil proceedings, such order damages the fairness of the judicial process. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[59]

[25,26] We have specifically held in reviewing a similar order that when a contemnor is required to serve a determinate sentence after a specified date if compliance has not occurred by that date, and there is no provision for discharge thereafter by doing what the contemnor had previously refused to do, then the sentence is punitive as of that date.[60] In circumstances where there is no provision for purging the contempt after a certain date, the contemnor no longer holds the keys to his or her jail cell as of that date.[61] The order ceases to be coercive, because the jail sentence is no longer subject to mitigation.[62] In the case of civil contempt involving the use of incarceration as a coercive measure, a court may impose a determinate sentence only if it includes a purge clause that continues so long as the contemnor is imprisoned.[63]

Here, the court failed to include the ability to purge after June 15, 2015. The court provided that Steven could avoid

---

[59] *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015); *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014).

[60] *Maddux v. Maddux, supra* note 33. See, also, *Hicks v. Feiock, supra* note 37. But see *Peters-Riemers v. Riemers*, 674 N.W.2d 287 (N.D. 2004).

[61] See *Hicks v. Feiock, supra* note 37.

[62] *Id.*

[63] See, *Hicks v. Feiock, supra* note 37; *Maddux v. Maddux, supra* note 33.

the 90-day determinate sentence only "by payment in full of the monies owed to [Madeline], the sum of $37,234.84, on or before June 15, 2015." Taken literally, the order provides that after June 15, Steven would no longer hold the keys to his jail cell, as is required in civil contempt. We conclude this simply was not the court's intention. We modify the 2015 order by adding to the end of the order the following: "Said sentence may be purged at any time by payment in full of the monies owed to Madeline, in the sum of $37,234.84."

## VI. CONCLUSION

We find no merit to Steven's assignments of error. But because these were civil proceedings, we modify the 2015 order so as to permit Steven to purge the contempt at any time during his period of incarceration. As so modified, we affirm the order of the district court.

Affirmed as modified.