IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

CARTER V. THOMPSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHRISTINA M. CARTER, APPELLEE,

V.

JASON A. THOMPSON, APPELLANT.

Filed January 14, 2020.    No. A-18-1189.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed in part, and in part reversed and remanded with directions.

Darren J. Pekny and Annie E. Mathews, of Johnson & Pekny, L.L.C., for appellant.

Terrance A. Poppe and McKynze P. Works, of Morrow, Poppe, Watermeier & Lonowski, P.C., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

INTRODUCTION

Jason A. Thompson appeals from the order of the district court for Lancaster County, which modified his child support obligation previously awarded in the decree dissolving his marriage to Christina M. Thompson, now known as Christina M. Carter. On appeal, Jason assigns error to the court's failure to employ a joint custody calculation in modifying child support, failure to allow a deduction for travel expenses associated with Jason's parenting time, and the retroactive modification of his child support obligation. In addition to seeking modification of the decree on various grounds, the parties filed opposing contempt actions, and Jason also appeals from the court's determination that he was in contempt, and Christina was not in contempt, of certain provisions of the original divorce decree and/or a subsequent amended decree. For the reasons set

- 1 -

forth below, we affirm the order on the issues raised in the modification and contempt trial. However, we reverse the separate amended purge order and remand with directions for the district court to make express findings regarding Jason's ability to comply with the order.

BACKGROUND

The parties were married in 2006 and divorced in 2014. They have one minor child, born in 2009. The divorce proceedings occurred in Douglas County. Christina had resided in Douglas County for more than 1 year prior to filing her complaint for dissolution of marriage, but she was living in Lincoln, Nebraska, when she filed her complaint and at the time of the decree. Jason resided in Omaha, Nebraska, at the time the decree was entered. The modification and contempt proceedings that are the subject of the present appeal occurred in Lancaster County. At the time of the modification/contempt trial at issue here, Christina continued to reside in Lincoln and Jason resided in Gretna, Nebraska.

The dissolution trial was held in November 2013 and March 2014, but the decree was not entered until the end of October. Prior to entry of the decree, Christina sought to hold Jason in contempt for violation of certain temporary orders. A hearing in that contempt action was held prior to entry of the decree, and on November 3, the district court entered an order, finding Jason in contempt for failure to pay his share of daycare expenses totaling $3,960.

On October 31, 2014, the district entered a decree dissolving the parties' marriage (decree was admitted into evidence in the current modification and contempt proceedings as exhibit 52). As relevant to the present appeal, the decree stated:

**2. *CHILD CUSTODY, SUPPORT AND VISITATION:*** The parties have entered into a Partial Parenting Plan. The Court hereby approves the Partial Parenting Plan and attaches it to this Decree as Exhibit A and incorporated herein with the same full force and effect as if all terms of the Parenting Plan were set forth separately in this Decree in their entirety with the following changes to become a part hereof:

a. ***Parenting Plan:*** [Christina] and [Jason] shall be awarded joint legal custody. [Christina] shall be awarded the primary physical possession of the minor child.

1. [Jason] shall have regular parenting time with the minor child every other weekend from Thursday at 6:00 p.m. to Sunday at 7:00 p.m.

2. [Jason] shall be given three consecutive weeks of parenting time during the school summer vacation. This shall begin at 12:00 p.m. on the Sunday starting the third week of summertime vacation and end at 12:00 p.m. on the Sunday at the end of the three week and one day period. Each party is allowed two consecutive weeks of uninterrupted vacation time with the minor child during the summer school break. [Jason] is to exercise his two interrupted [sic] consecutive weeks of parenting time with the minor child during the three week period where he has possession of the minor child. [Jason] is to give 60 days [of] notice to [Christina] as to when he wants to exercise his three weeks of summer vacation.

Paragraph 7B of the attached Partial Parenting Plan titled 'Vacation' is hereby declared void in its entirety.

(Emphasis in original.) The parenting plan portion of the decree set forth other provisions including that the parties were each allowed two phone calls per day when the child was in the other party's possession and that the parties were to meet at the halfway point between their residences for parenting time exchanges. The court ordered Jason to pay child support of $320 per month. It also ordered the parties to each pay 50 percent of employment related daycare expenses on behalf of the child. The court awarded Christina a judgment of $4,132 against Jason for past due daycare expenses. The only provision of the property division portion of the decree relevant to the present appeal is the court's determination that both parties were responsible for "one half of any tax amount occurring as the result of an IRS forgiven debt." The court stated that there had been no evidence presented indicating "what the exact current amount of IRS debt is." Accordingly, the court determined that the parties were each liable for 50 percent.

One of the issues in the present contempt proceedings has been what portions of the partial parenting plan remained in effect after entry of the decree and the subsequent amended decree. The partial parenting plan attached to the decree provided as follows with respect to regular and vacation parenting time:

7. [Christina] and [Jason] agree on the following parenting time arrangements:

A. [Jason] shall have parenting time on alternating weekends. Prior to [the child] star[t]ing kindergarten, the weekend parenting time will start on Thursday evening at 6:00 p.m. and conclude on Sunday evening at 7:00 p.m. After [he] starts kindergarten, the weekend parenting time will start on Friday at 6:00 p.m. and conclude on Sunday at 7:00 p.m. However, if [the child] does not have school on the Friday preceding [Jason's] weekend, parenting time for that weekend will start on Thursday at 6:00 p.m.

[Christina] shall have parenting time for the remainder of the week and weekends except as set forth above for [Jason's] parenting time.

B. Vacation: Each parent shall have up to fourteen (14) days of vacation parenting time each year with the minor child. Each parent shall provide a minimum of sixty (60) days [of] notice of the dates he/she intends to exercise vacation parenting time. Vacation parenting time cannot conflict with the holiday schedule and cannot conflict with the school schedule without the consent of both parties. When parenting time includes leaving the Omaha area for travel, telephone and address information, and a travel itinerary shall be provided to the other parent.

Prior to [the child] starting kindergarten, vacation parenting time cannot exceed seven (7) days. After the start of kindergarten, parenting time can exceed seven (7) days in one vacation. At no time, can vacation parenting time be tacked onto regular weekly parenting time or holiday parenting time.

The record on appeal does not include any postdissolution motions the parties might have filed or the bill of exceptions from any postdissolution hearings, but the evidence in the current modification/contempt proceedings indicates that the parties sought clarification as to some part of the decree, after which the district court entered a second decree, labeled as "DECREE OF DISSOLUTION OF MARRIAGE NUNC PRO TUNC." This second decree, however, makes substantive changes in addition to correcting certain clerical errors, and is not properly a nunc pro

tunc order. See *In re Interest of Luz P. et al.*, 295 Neb. 814, 891 N.W.2d 651 (2017) (order nunc pro tunc differs from order substantively amending or vacating court's prior order; purpose of order nunc pro tunc is to correct clerical or formal errors in order to make record correctly reflect judgment actually rendered by court). See, also, Neb. Rev. Stat. 25-2001(3) (Reissue 2016). Throughout this opinion, we have referred to this order (admitted into evidence in the modification and contempt proceedings as exhibit 53) as the "January 2015 amended decree" or the "amended decree."

The amended decree, entered by the district court on January 27, 2015, is essentially identical to the original decree, except for certain substantive (and a few clerical) changes. As relevant to the present appeal, the amended decree included the following parenting plan provisions (new language underscored; former language struck through):

a. ***Parenting Plan:*** [Christina] and [Jason] shall be awarded joint legal custody. [Christina] shall be awarded the primary physical possession of the minor child.

1. [Jason] shall have regular parenting time with the minor child every other weekend from Thursday at 6:00 p.m. to Sunday at 7:00<u>6:00</u> p.m.

2. [Jason] shall be given three consecutive weeks of parenting time during the school summer vacation. This shall begin at 12:00 p.m. on the Sunday starting the third week of summertime vacation and end at 12:00 p.m. on the Sunday at the end of the three week and one day period.

<u>3.</u> Each party is allowed two consecutive weeks of uninterrupted vacation time with the minor child during the summer school break. [Jason] is to exercise his two <u>un</u>interrupted consecutive weeks of parenting time with the minor child during the three week period where he has possession of the minor child. [Jason] is to give 60 days [of] notice to [Christina] as to when he wants to exercise this three weeks of summer vacation. <u>These two weeks shall be exercised within the weeks that [Christina] or [Jason] actually has the child in their primary possession.</u>

Paragraph 7B of the attached Partial Parenting Plan titled 'Vacation' is hereby declared void in its entirety.

(Emphasis in original.) Neither party appealed from the January 2015 amended decree.

On February 1, 2016, Christina filed a complaint for modification in the Lancaster County District Court. As relevant to the present appeal, Christina asked the district court to increase Jason's child support obligation due to an alleged substantial increase in income. She also alleged that application of the Nebraska Child Support Guidelines would increase Jason's child support obligation by more than 10 percent. Christina also filed an application for an order to show cause, in which she asked the court to find Jason in contempt due to his failure to pay his share of the tax amount resulting from the Internal Revenue Service (IRS) forgiveness of a marital debt and his share of employment-related daycare expenses as ordered in the decree.

On August 29, 2016, Jason filed an answer and cross-application for modification. In his application for modification, Jason alleged a material change in circumstances and sought sole legal and physical custody of the parties' child. He also asked the district court to terminate his child support obligation and to order Christina "to assume financial support for the minor child"

- 4 -

pursuant to the child support guidelines. On September 8, Jason filed a verified application for contempt citation, asking the court to find Christina in contempt due to her refusal to allow him overnight parenting time "from the entry of the Decree to May of 2016 and August 18, 2016"; her failure to allow Jason telephone contact with the minor child; her failure to discuss certain issues with Jason, placing the child in therapy without discussing it with Jason, and enrolling the child in various extracurricular activities without Jason's input or consent; and her failure to pay certain unreimbursed medical expenses and certain daycare expenses for the child.

The district court entered orders to show cause in the contempt actions brought by Christina and Jason on February 16 and September 12, 2016, respectively.

The modification and contempt trial was held on January 29 and 30, 2018. At trial, the parties stipulated to the custody determination and parenting time as set forth in a new parenting plan (2018 parenting plan) that was offered and accepted by the court. The court then heard testimony from the parties, Jason's current wife, and the child's guardian ad litem, and it received various exhibits relating to the issues of child support and contempt. We have set forth specific evidence relevant to the issues on appeal in the analysis section below.

On September 28, 2018, the district court entered an order ruling on the issues raised in the modification and contempt trial. The court found that a material change of circumstances had occurred since entry of the decree and the amended decree, found that the 2018 parenting plan was in the child's best interests, and ordered the parties to comply with it. Under the 2018 parenting plan, the parties were given joint legal and joint physical custody of the child, although the plan specified that the child's primary residence would be with Christina, and it included a "9/5 rotating parenting time schedule" during the school year and a rotating 2 weeks on/2 weeks off schedule during the summer. The court increased Jason's child support obligation to $439 per month, commencing February 1, 2016. In doing so, the court calculated Jason's obligation based on Christina's current earnings and Jason's earning capacity. The court declined to find that child support should be determined based on a joint custody calculation because Jason's overnight parenting time with the child was approximately 38 percent of the year. The court also noted that the evidence and the history in this case shows "an inability by the parties to have a level of communication and cooperation necessary to share and timely pay such expenses." The court declined to allow a downward deviation for travel expenses because each party was required under the 2018 parenting plan to incur travel and because there had been no such downward deviation at the time of the entry of the decree. The court found Jason in contempt of the decree and amended decree for his failure to pay work or school related daycare expenses incurred by Christina and for his failure to pay his portion of the debt to the IRS incurred by Christina as a result of debt forgiveness associated with her 2013 income tax return. The court found that the judgment entered against Jason in the decree for $4,132 should be deemed satisfied in full. The court ordered Jason to pay Christina $5,000 for her attorney fees. The court found Jason had failed to sustain his burden of proof with respect to the application for contempt filed against Christina. The court made other findings not relevant to the issues on appeal and stated that all other provisions of the decree and amended decree not specifically modified in its order remained in full force and effect.

On September 28, 2018, the district court entered a separate purge order. In the purge order, the court stated that Jason was in contempt for failing to pay 50 percent of the IRS debt resulting

from a debt forgiveness and 50 percent of the daycare expenses incurred on behalf of the minor child as ordered by the court in the decree. The court entered judgments against Jason and in favor of Christina in the sum of $4,764.50, representing Jason's share of the IRS debt resulting from the debt forgiveness, and in the sum of $8,689.77, representing Jason's share of daycare expenses incurred on behalf of the minor child through December 18, 2017, and which also included all sums due for daycare pursuant to the decree (the $4,132 noted above). The court sentenced Jason to jail for a period of "sixty [sic] (30) days" for failure to pay his share of the IRS debt and daycare expenses incurred on behalf of the minor child. The court specified that Jason could purge himself of contempt by paying $4,000 on the IRS judgment within 60 days of the purge order and not less than $300 per month on the remaining balance, "commencing October 15, 2018." The purge plan for the daycare judgment specified that Jason could purge himself of contempt by paying $2,500 toward that judgment within 60 days of the purge order and not less than $250 per month on the remaining balance, commencing on November 1. The court did not make any specific findings regarding Jason's ability to pay the lump sums within the timeframe specified by the order.

On October 9, 2018, Jason filed a motion for new trial and/or in the alternative to alter or amend the September 2018 order and the accompanying purge order. He requested various alterations or amendments to the modification and purge orders, and his allegations included an assertion that the purge order was unconscionable "pursuant to [Jason's] income and inability to pay as the Court in its Order dated July 17, 2018 found [Jason] indigent for the purposes of paying Guardian ad Litem fees" and ordered that those fees be paid by Lancaster County. Jason's requests for relief included a request that the court vacate the purge order.

On November 20, 2018, the district court entered an amended order on modification, making several amendments to the first modification order not relevant to the issues on appeal, except for the court's finding that Jason had incurred $1,368.20 for medical expenses not covered by insurance which should be reimbursed by Christina. The court also entered an amended purge order, which amended the judgment entered against Jason in connection with the daycare expenses to reflect an offset for the unreimbursed medical expenses incurred by Jason. The amended purge order still set forth Jason's jail sentence as "sixty [sic] (30) days" and did not contain any findings about his ability to pay. The parties filed a stipulated motion for an order nunc pro tunc, and on December 27, the court entered an order nunc pro tunc, correcting the sentence to "thirty (30) days."

Jason filed a motion to set supersedeas bond and stay sentence on December 7, 2018. He attached an affidavit of financial condition disclosing his assets, real and personal, and related encumbrances. The record does not include any ruling by the district court on this motion.

## ASSIGNMENTS OF ERROR

Jason asserts that the district court erred in (1) declining to calculate his child support obligation based on a joint custody calculation pursuant to Neb. Ct. R. § 4-212 (rev. 2011), (2) declining to allow Jason a deduction for travel expenses associated with his parenting time pursuant to Neb. Ct. R. § 4-210, (3) ordering Jason to pay retroactive child support to Christina, (4) finding Jason to be in willful and contumacious contempt of court, (5) awarding Christina attorney fees, (6) sentencing Jason to jail time in the amended purge order while failing to make a

finding of his ability to purge himself of the sentence, and (7) failing to find Christina in willful and contumacious contempt of court.

## STANDARD OF REVIEW

Modification of child support is entrusted to the discretion of the trial court. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Id.* A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

Interpretation of the Nebraska Child Support Guidelines presents a question of law. *Id.* When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions. *Id.*

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion. *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019). Though the ability to pay the purge amount in a civil contempt proceeding is a factual question that is reviewed for clear error, whether the facts result in a due process violation is a question of law. *State on behalf of Mariah B. & Renee B. v. Kyle B.*, 298 Neb. 759, 906 N.W.2d 17 (2018).

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Costs, including reasonable attorney fees, can be awarded in a contempt proceeding. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). When an attorney fee is authorized, the amount of the fee is addressed to the trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Patera v. Patera*, 24 Neb. App. 425, 889 N.W.2d 624 (2017).

## ANALYSIS

*Joint Custody Child Support Calculation.*

Jason asserts that the district court erred in declining to calculate his child support obligation based on a joint custody calculation pursuant to § 4-212, which provides:

> When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. When a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court. If child support is determined under this paragraph, all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental contributions

(worksheet 1, line 6). For purposes of these guidelines, a 'day' shall be generally defined as including an overnight period.

Here, the court declined to perform a joint custody child support calculation using worksheet 3, finding that Jason's overnight parenting time with the child was approximately 38 percent of the year and because the parties had shown an inability to communicate and cooperate in the payment of expenses for the child.

The 2018 parenting plan provides for a "9/5 rotating parenting time schedule" during the school year and a rotating 2 weeks on/2 weeks off schedule during the summer. During the school year, Jason's parenting time runs from Thursday after school (every other week) until Tuesday morning (every other week) when he returns the child to school; however, the schedule provides that if there is no school on a Tuesday ending Jason's parenting regular parenting time, his time will then extend to Wednesday morning. At trial, Christina submitted a demonstrative exhibit, calculating Jason's overnights per year with 109 days during the school year and 30 days during the summer for a total of 139 days or 38 percent of the entire year. On cross-examination, she was asked about the effect on the calculation prepared by her attorney of the parenting time provision allowing for the possibility of Jason receiving additional days, and she testified, "I think our discussion was that that wasn't really relevant any longer because he was now getting until Tuesday morning and most of those dates were Monday." During his testimony, Jason testified that he calculated 140 overnights under the 2018 parenting plan with the possibility of additional overnights.

On appeal, Jason argues that when parenting time "is totaled based on the regular parenting time of each party," he would have had "145 days with the minor child" in 2018 and "is estimated to have at least 143 days with the minor child" in 2019. Brief for appellant at 18. He argues that the district court should have applied the rebuttable presumption of § 4-212 in this case, and he cites *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012) where this court found the use of worksheet 3 proper when the father had 156 guaranteed days of parenting time and had rounded up to an estimated total of 160 days based on the mother's required work travel. In this case, however, the evidence, despite Jason's assertions in his brief, does not support a conclusion that Jason's guaranteed days of parenting time exceed 142 days. Nor is it clear whether the extra day provision of the parenting plan will result in any additional days, given Christina's testimony that most days off from school occur on Mondays.

"Joint physical custody" as defined by the Parenting Act means "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). Clearly, the 2018 parenting plan allows Jason to exert regular continuous blocks of parenting time. However, child support payments should generally be set according to the child support guidelines. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Section 4-212 provides for a rebuttable presumption that child support should be calculated using worksheet 3 if each party's parenting time exceeds 142 days per year. That has not been shown here. Use of worksheet 3 is within the court's discretion when one party's

parenting time is between 109 and 142 days. The district court declined to use worksheet 3 here based on Jason's parenting time of approximately 38 percent of the year.

Even if Jason's total parenting time exceeds 142 days per year, the use of worksheet 3 is a rebuttable presumption. The district court could have still concluded use of worksheet 3 was not appropriate in this case because it necessitates more direct sharing of child-related expenses and thus increased communication between the parties. Notably, the district court specifically stated that it also declined to use worksheet 3 due to the parties' difficulties in communicating and working together to divide child-related expenses. Jason argues that this reasoning is "shortsighted," given that the parties have joint legal custody which arguably necessitates more communication than "the indirect effects of a joint physical custody child support calculation." Brief for appellant at 19. However, we note that the legal custody portion of the parenting plan sets forth a very detailed plan for making decisions relating to the child's healthcare, school, extracurricular activities, and religious education in the event the parties do not agree on these matters. Clearly, this detailed plan takes into account the fact that the parties have had difficulties agreeing on such matters in the past.

The decision about whether to utilize a joint custody calculation in determining Jason's child support obligation was within the district court's discretion, and it did not abuse its discretion in declining to use worksheet 3.

*Deduction for Travel Expenses.*

Jason asserts that the district court erred in declining to allow him a deduction for travel expenses associated with his parenting time pursuant to § 4-210. The court declined to allow any downward deviation for travel expenses because each party was required to incur travel under the 2018 parenting plan and there had been no such downward deviation at the time of the decree.

The Nebraska Child Support Guidelines are to be applied as a rebuttable presumption and deviations must take into consideration the best interests of the child. Neb. Ct. R. § 4-203. (rev. 2011). Section 4-210 provides in part that "[a]ny documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines." As with other parenting time determinations, the matter of travel expenses associated with visitation is initially entrusted to the discretion of the trial court. See *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). There is no immutable standard for the allocation of travel expenses associated with parenting time; instead, the determination of reasonableness is made on a case-by-case basis. See *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

The 2018 parenting plan provided for a 9/5 rotating scheduling during the school year and a 2 weeks on/2 weeks off rotating schedule during the summer. At trial, Jason testified about the distance between his residence in Gretna and Sawyer's school in Lincoln, the pick-up/drop-off point for his parenting time exchanges during the school year under the 2018 parenting plan. The 2018 parenting plan provides that during the summer, each party is to pick up the child at the start of that party's parenting time. Jason testified that under the decree, "[a]ll of our exchanges happened at the midway point." He discussed a "Google map that references the mileage from [his] house to Sawyer's school" that showed a one-way distance of 47.9 miles. The map was not

offered into evidence. According to Jason, when he prepared his proposed child support calculation, he rounded down to 45 miles for a round-trip distance of 90 miles, which amounted to a deduction of about $452 "for the mileage at the federal rate." His calculated deduction only involved trips to and from school and did not include any transportation associated with extracurricular activities. Jason agreed that under the 2018 parenting plan both parties would incur some travel expenses associated with taking the child to Gretna or Lincoln for certain activities.

The 2018 parenting plan includes provisions about the minor child's activities, decisionmaking related to those activities, and the impact those activities are allowed to have on each party's parenting time. As relevant here, the plan provides that "[a]ctivities should have a minimum amount of impact on the other parent's parenting time and [Christina and Jason] will take into consideration the other parent's parenting time and travel time when signing the minor child up for the activities." It provides further that "should practices be on an exchange day, the parent signing the minor child up for that activity has the burden of bringing the minor child to the other parent's residence after the practice." At the start of trial, in discussion with the court, the guardian ad litem clarified, and the parties' attorneys agreed, that the goal of this provision had been to minimize trips and travel time for the child on exchange days.

In declining to allow the requested deduction, the district court relied on the fact that the 2018 parenting plan required both parties to travel and the fact that no travel expense deduction had been given at the time of the decree. Given that the burden of travel was distributed evenly at that point, the lack of a travel expense deduction at the time of the decree was logical. While the 2018 parenting plan places a somewhat greater burden on Jason during the school year than did the arrangement under the decree, the 2018 plan does require some travel by both parties due to parenting time exchanges, including on the occasions when the child has activities in Lincoln on Thursdays at the start of Jason's parenting time during the school year, which places the burden on Christina to transport the child to Jason's residence after that activity. And, both parties will incur travel expenses during the summer months.

Upon our de novo review, we cannot say that the district court abused its discretion in declining to allow a deduction for travel expenses associated with Jason's parenting time.

*Retroactive Child Support.*

Jason asserts that the district court erred in ordering him to pay retroactive child support to Christina. Christina's complaint for modification in this case was filed in February 2016, and a modification trial was initially scheduled for July 27. Trial, however, was continued multiple times upon various requests by both parties before finally occurring on January 29 and 30, 2018. The court made the modification of Jason's child support obligation retroactive to February 1, 2016.

Whether a child support order should be retroactive is entrusted to the discretion of the trial court, and an appellate court will affirm its decision absent an abuse of discretion. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances. *Id.* As part of that consideration, the court must consider whether the obligated party has the ability to pay the lump-sum amount of a retroactive award. *Sellers v. Sellers*, 23 Neb. App. 219, 869 N.W.2d 703 (2015). Absent equities to the contrary, modification

of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. *Johnson v. Johnson, supra*. In modification of child support proceedings, the children and the custodial parent should not be penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. *Id.* However, in the absence of a showing of bad faith, it is an abuse of discretion for a court to award retroactive support when the evidence shows the obligated parent does not have the ability to pay the retroactive support and still meet current obligations. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013).

The district court based its modified child support calculation on Jason's earning capacity of $35,000. Jason was unemployed at the time of the modification trial, having been unemployed since October 5, 2017. Prior to his termination, which Jason attributed to the multiple trips associated with picking up the child for his parenting time, he was earning $35,000 per year with occasional bonuses. Jason was applying for jobs but had not been offered other employment at the time of trial. He was receiving $408 per week in unemployment benefits, with a maximum possible receipt of $10,000 before those benefits ended. He had received approximately $1,600 or $1,800 in benefits at the time of trial.

Jason argues that an award of retroactive support will not allow him to meet his modified current child support obligation. Jason argues further that although he accepted an earning capacity of $35,000 for use in calculating his modified support obligation, "this still does not provide the court of the general circumstances necessary in order to find [his] ability to pay." Brief for appellant at 24. He contrasts his situation with situation in *Riggs v. Riggs*, 261 Neb. 344, 622 N.W.2d 861 (2001) where the Nebraska Supreme Court found retroactive modification proper in light of the obligated parent's steady employment and substantial salary.

Christina argues that retroactive modification was proper in this case given that Jason and his wife drive separate vehicles, they took two vacation trips in the year prior to the modification trial, they purchased a $221,000 house a little over 2 years prior, and Jason was current on all of his bills (with the exception of daycare), which she argues suggests that he had the ability to pay the retroactive award.

The district court modified Jason's child support obligation from $320 per month to $439 per month; a difference of $119 per month. The modification order was entered on August 28, 2018, and accordingly, ordering the support to be retroactive to February 1, 2016, amounts to 32 months of retroactive support. According to our calculations, the total retroactive child support amounts to $3,808 (32 months × $119 difference). The order provides that delinquent child support will bear interest at 4.136 percent.

Although the district court did not make specific factual findings regarding the equities of the situation, including Jason's ability to pay, we cannot say that the district court did not consider these factors in ordering retroactive support. In our de novo review of the record, we conclude that the district court did not abuse its discretion in ordering retroactive child support. Christina requested at trial that the child support modification be made retroactive. Jason did not present any specific evidence about his inability to pay increased child support retroactively. While Jason had lost his job approximately 4 months prior to the trial, he had been employed the majority of the time the case was pending. The evidence shows that Jason was able to meet his financial

obligations with the exception of the daycare expenses which were the subject of the contempt action. Jason and his wife purchased a home and took vacations during this time period. In sum, the record does not support Jason's assertion that he was unable to pay the retroactive child support. We find no abuse of discretion in the court's order of retroactive support.

*Finding Jason in Contempt of Court.*

Jason asserts that the district court erred in finding him to be in willful and contumacious contempt of court. The court found Jason in contempt for his failure to pay his share of an IRS debt associated with the forgiveness of a marital debt and his share of work or school-related daycare incurred by Christina. Jason challenges both of these contempt findings.

Civil contempt proceedings are instituted to preserve and enforce the rights of private parties to a suit when a party fails to comply with a court order made for the benefit of the opposing party. *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019). Willful disobedience is an essential element of contempt; "willful" means the violation was committed intentionally, with knowledge that the act violated the court order. *Id.* Outside of statutory procedures imposing a different standard or an evidentiary presumption, all elements of contempt must be proved by the complainant by clear and convincing evidence. *Id.* If it is impossible to comply with the order of the court, the failure to comply is not willful. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). Willfulness is a factual determination to be reviewed for clear error. *Id.*

In the decree and amended decree, the district court found that both parties were responsible for "one half of any tax amount occurring as a result of an IRS forgiven debt." The court further found that there was "no evidence presented to the Court indicating what the exact current amount of IRS debt is" and stated that it could thus "only determine that they are each liable for 50%."

During the modification/contempt trial, Christina offered a copy of a letter from Chase Cardmember Service, indicating that Chase would no longer attempt to collect the unpaid debt on her account and would report the unpaid principal balance of $24,176.05 (which did not include fees or interest) to the IRS for the 2013 tax year. Christina testified that at the time of the divorce proceedings, it was recognized that she would need to claim the amount of the forgiven debt as income for tax purposes, but that the amount of the tax liability was not then known because she had not completed her 2013 income tax return.

Copies of Christina's 2013 income tax returns were received into evidence at the modification/contempt trial as exhibits 12 and 13. According to Christina, exhibit 12 shows the amount of federal and state income tax she would have owed "with no debt forgiveness shown on the return" and exhibit 13, the copy she filed with the IRS, shows her tax amounts (federal only) with the income from "the debt forgiveness from Chase" included. The district court also received a copy of a statement from the Nebraska Department of Revenue for the filing of the 2013 state return including the debt forgiveness income. Christina testified that she had paid both the IRS and the Nebraska Department of Revenue with respect to the filing of her 2013 federal and state income tax returns.

Christina calculated Jason's share of the tax debt owed as a result of the inclusion of the debt forgiveness income to be $4,764.50. The court received a copy of her calculation as a demonstrative exhibit only. Jason does not challenge Christina's calculation on appeal.

Christina testified that she provided Jason "copies of these tax returns" multiple times and that he had not paid her "any sums with respect to that 2013 tax return." When asked if at any time during the previous five years Jason had offered to pay any portion of $4,764.50, she testified, "No, he's refused." When asked when she first notified Jason regarding the tax debt, she testified that "[i]t was part of the discussion . . . at the final divorce hearing," although she clarified that she only had the letter from Chase at the time of the divorce trial and had not yet completed her tax returns. She was asked about whether it would "make more sense" to amend her 2013 return and "each take half of it," and she replied that she would not be willing to do so at this point, given how much time had passed, and because she had already paid all of the tax owed. The district court received a copy of an email Christina sent Jason in February 2015 with attached documentation notifying him that he owed her $3,658.60. She denied that this email was the first time she had advised him of or sent him documents as to the amount of liability.

Jason was asked at trial whether it was his position that he does not owe Christina anything with respect the IRS debt arising from the debt forgiveness. He indicated that that was not his position, and he confirmed that he has not paid anything to Christina for the IRS debt. On appeal, he does not challenge the amount as calculated by Christina. Jason testified the February 2015 email from Christina was the first notification given to him of the actual amount of the tax debt. According to Jason, prior to that, he had not seen any documentation about "if that was paid or what [Christina] had done with that debt." He did not specifically recall seeing the letter from Chase at the time of the divorce trial. Jason testified that he had contacted the IRS to inquire what would be the best way to divide a tax liability of this nature and indicated that the IRS recommended each party separately claim half of the total amount of the forgiven debt on their own tax returns. Jason indicated that he was willing to amend his 2013 tax return to include the income related to half of the forgiven debt but that he had not yet done so as his former attorney had advised waiting for a decision from the court.

On appeal, Jason argues that his failure to comply with the IRS tax debt provision of the decree and amended decree was not willful because the decree failed to set forth an exact amount of the IRS debt the parties would owe and because the decree did not set forth a clear procedure for repayment of the tax obligation. Although an actual dollar amount or method for repayment was not provided in the decree, the decree clearly specified that each party was responsible for half of the tax amount resulting from the debt forgiveness. While Jason argues that the amount of the tax obligation was uncertain, the record shows that Jason has known since at least February 2015 that Christina had amended her tax return and provided him with information concerning the amount of tax owed and that he had not made any effort to resolve any disagreement he may have had over the amount or make any payment toward that debt by the time of the modification/contempt trial. The district court did not abuse its discretion in finding Jason in willful contempt for failing to comply with the provision of the decree and amended decree requiring him to pay 50 percent of the tax debt.

The district court also found Jason to be in willful contempt of court for failure to reimburse Christina for certain work-related daycare expenses for the minor child. In the decree and amended decree, the court ordered each party to pay 50 percent of the employment-related daycare expenses of the minor child. The party requesting reimbursement was to present receipts to the other party within 14 days of receiving said invoice or receipt and was to receive reimbursement with 14 days of demand for payment.

There was considerable evidence presented at the modification/contempt trial on the issue of the unpaid daycare expenses. Jason agreed he had an obligation to pay daycare costs incurred by Christina on behalf of the child. He confirmed that he had not made any payment on the child's current daycare obligation from August 2017 until trial. He agreed that he had previously been found in contempt for failing to pay daycare amounts, that a judgment of about $4,100 had been entered against him, and that the balance on that judgment was about $2,100. Jason was asked when he planned to resume paying on daycare "as it accrues on a monthly basis," and he testified that based on his understanding of a conversation with the guardian ad litem, each party would be responsible for the daycare costs incurred during their respective parenting time, although he agreed he had not seen any order to that effect. The guardian ad litem testified about an email she had sent to Jason and indicated that the June 2017 email, which was sent to both parties, was to inform him about what had happened at a hearing at the start of the summer. She agreed that her understanding was that "everybody is going to pay for their own day care that applied to the summer." The email stated, in a list of things "[t]he [j]udge said," that "[e]ach parent is responsible for child care on his or her own time. There will be no requirement of transporting [the child] to the other parent during the day."

Christina has utilized various daycare providers since the divorce, and she testified that she made Jason aware of where the minor child was going to daycare via email. Christina testified that she had had difficulty in getting Jason to pay his share of daycare expenses since they separated and that he had not paid any daycare expenses since August 2017. She offered and the court received various exhibits documenting her daycare expenses, including her income tax returns for 2014-2016. The returns for 2014 and 2015 include copies of "Form 2441," showing daycare expenses of $9,725 in 2014 and $2,757 in 2016. Christina indicated that there was not a similar form in her 2015 return because she understood from her accountant that she could not claim the daycare expenses that year since the parties were claiming the child as a dependent for tax purposes in alternating years. Christina also compiled a document with various attached statements and invoices generated by the daycare providers, which was received by the court, showing her total daycare expenses allegedly owed by Jason. According to her calculations in that exhibit, and about which she testified, the remaining balance on the prior daycare judgment entered against Jason was $1,277, the daycare owed by Jason between February 2014 and May 2017 was $6,890.27, and the amount owed by Jason between August 2017 and December 18, 2017, was $522.50, for a total amount owed of $8,689.77.

Christina also testified about her method for notifying Jason of daycare expenses. She stated that she would usually email him within 24 hours of receiving a bill for daycare expenses although she may have texted him a picture of the most recent notice on some occasions. As an example of one such notification, Christina offered an email sent to Jason in June 2016, which she

- 14 -

described at trial as "a summary of all the childcare expenses from the beginning through it looks like part of 2016, including a separation of judgment and post-judgment." Christina then testified that she just stopped sending Jason daycare bills in January 2018, for multiple reasons including his failure to make payments since August 2017, one of the daycare providers changing "how they record statements," and because Christina knew the parties "were attending court." Jason also testified about the manner in which Christina would typically advise him of the child's daycare expenses. According to Jason, Christina would generally send an email at the end of each year stating the amount he owed for daycare expenses. Jason testified that Christina would just send a year-end statement and never included any proof of payments or invoices with these emails.

Jason's primary argument on appeal about the finding of contempt for failure to pay his share of the daycare expenses is that any violation on his part could not have been willful as Christina did not provide him with receipts or invoices showing what he owed in a timely manner. He also argues that his violation was not willful given the evidence that he did make payments toward both the past judgment and the ongoing daycare obligation. Jason admits, however, to being provided with some evidence of his obligation by Christina. Regardless of whether Christina met her obligation to present Jason with receipts within 14 days of receiving receipts or invoices from the daycare providers, the record shows that Jason was not current on the daycare expense obligation at the time of the modification/contempt trial and did not meet his obligation to reimburse Christina within 14 days of demand for payment. The district court did not abuse its discretion in finding Jason in willful contempt for failing to comply with the provision of the decree and amended decree requiring him to pay certain daycare expenses of the minor child.

*Award of Attorney Fees.*

Jason asserts that the district court erred in awarding Christina attorney fees of $5,000. He argues that the court's decision to award Christina attorney fees "is clearly hinged on the trial court's finding that [Jason] was in willful and contumacious contempt of a court order." Brief for appellant at 31. We disagree. An award of attorney fees is allowable in both modification and contempt actions. See *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014), and *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). The court did not specifically tie the award of attorney fees to either the modification or the contempt actions in this case. But, given placement of the paragraph awarding attorney fees in between the court's findings about the modification issues and the contempt issues, it seems just as likely that the award of attorney fees was connected to Christina's modification action as to her contempt action. Regardless, Jason only argues that the award was improper because the finding of contempt was improper. He does not otherwise challenge the award of attorney fees. We have already determined that the court did not abuse its discretion in finding Jason in contempt of court. Thus, his argument must fail.

The district court received an attorney fee affidavit from Christina's attorney. The affidavit and attached fee and cost statements show that his billing rate was $250 per hour, which he stated "is customary for community standards," and that as of January 26, 2018, Christina had incurred attorney fees of $11,383.80 and costs of $399.41 for a total of $11,783.21. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required

for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019).

The fee here was not unreasonable. Christina filed her modification and contempt actions nearly 2 years before the modification/contempt trial. Christina's attorney succeeded in having Jason held in contempt as discussed above and successfully pursued Christina's request to modify child support. We find no abuse of discretion in the award of $5,000 in attorney fees.

*Sentence in Amended Purge Order.*

Jason asserts that the district court erred in sentencing him to jail time in the amended purge order while failing to make a finding of his ability to purge himself of the sentence.

A criminal or punitive sanction is invalid if imposed in a proceeding that is instituted and tried as civil contempt, because it lacks the procedural protections that the Constitution would demand in a criminal proceeding. *State on behalf of Mariah B. & Renee B. v. Kyle B.*, 298 Neb. 759, 906 N.W.2d 17 (2018). A present inability to comply with a contempt order is a defense, not necessarily to contempt, but to the sanction of incarceration. *Id.*

When a purge order involves payment of money, the sum required to purge oneself of contempt must be within the contemnor's ability to pay within the time period provided in the order, taking into consideration the assets and financial condition of the contemnor and his or her ability to raise money. *Id.* See also, *Sickler v. Sickler*, 293 Neb. 521, 878 N.W.2d 549 (2016). Contemnors in civil contempt must carry the keys of their jail cells in their own pockets. *Id.*

Despite any overlap with the finding of willful disobedience in the underlying contempt, a court that imposes incarceration as part of civil contempt proceedings shall make express findings regarding the contemnor's ability to comply with the purge order. *Id.* It is the contemnor who has the burden to assert and prove the inability to comply with the contempt order as a defense to incarceration. *Id.* The burden of both production and persuasion is on the contemnor to show the present inability to comply. *Id.* A showing of inability to comply with a purge order entails attempts to exhaust all resources and assets or borrow sufficient funds and the inability to thereby secure the funds to comply with the order. *Id.* The contemnor's inability to comply with a contempt order cannot be voluntarily created, for example by not diligently seeking a job at one's earning potential. *Id.*

Jason challenges the district court's failure to explicitly find that he had the ability to comply with the contempt order. Jason did raise the issue of his ability to pay in his motion for new trial and/or alter or amend, but the court did not address the issue in the amended purge order, which only changed the amount of one of the judgments entered against Jason based on an offset for unreimbursed medical expenses incurred by Jason. Although we do not have a record from the hearing on Jason's motion to determine whether Jason met his burden of proof regarding his claimed inability to pay, we nevertheless conclude that the district court failed to make any express findings on this issue, requiring us to reverse the amended purge order and remand for an express determination on Jason's ability to comply with the contempt order based upon the evidence adduced at trial and at the hearing on Jason's motion for new trial and/or alter and amend.

*Failure to Find Christina in Contempt of Court.*

Jason asserts that the district court erred in failing to find Christina in willful and contumacious contempt of court. Jason sought to hold Christina in contempt for not allowing him to have his regular Thursday night parenting time with the child, not allowing him to have telephone contact with the child, not discussing certain issues pertaining to the child with him, and failing to reimburse him for certain expenses.

The initial partial parenting plan provided that Jason's alternating weekend parenting time would begin on Thursday evenings until the child started school and would begin on Friday evenings once the child started kindergarten. There was considerable evidence at trial about the parties' confusion with respect to the effect of the amended decree on this provision, with Christina arguing that the provision remained in effect and Jason arguing that under the amended decree, his parenting time continued to start on Thursday evenings. The court heard evidence on the issues raised in Jason's contempt application and then found that Jason did not carry his burden to establish Christina was in willful and contumacious contempt of an order of the court. In doing so, the court clearly gave greater weight to Christina's evidence and testimony. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). Accordingly, we find no clear error in the court's factual findings with respect to whether any violation of the decree and amended decree by Christina was willful. The court did not abuse its discretion in failing to find Christina in contempt of court.

CONCLUSION

The district court did not abuse its discretion in declining to use worksheet 3 in calculating Jason's child support obligation, declining to allow Jason a deduction for travel expenses associated with his parenting time, making the modified award of child support retroactive to February 1, 2016, finding Jason in contempt of court, awarding Christina attorney fees, or failing to find Christina in contempt of court. However, the district court failed to make express findings regarding Jason's ability to comply with the amended purge order. We therefore reverse the amended purge order and remand the cause to the district court to make express findings regarding Jason's ability to comply with the amended purge order. The balance of the court's orders are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.